UNITED STATES of America

v.

Carolyn KRAVETZ and Boris Levitin, Defendants.

Criminal No. 08–10251–JLT.

United States District Court, D. Massachusetts.

June 6, 2013.

---

Vassili Thomadakis, William H. Connolly, U.S. Attorney's Office, Boston, MA, for United States of America.

Joseph Balliro, Sr., Balliro & Mondano, Robert L. Peabody, Nystrom Beckman & Paris LLP, Boston, MA, Jeffrey Lichtman, Law Offices of Jeffrey Lichtman, Marc Fernich, New York, NY, for Defendants.

## ORDER AND MEMORANDUM

TAURO, District Judge.

This matter stems from criminal proceedings against codefendants Carolyn Kravetz and Boris Levitin. On July 22, 2010, and November 15, 2010, this court sentenced Kravetz and Levitin, respectively. Both defendants filed sealed sentencing memoranda and letters of support with the court.

These proceedings caught the attention of non-party reporter Jim Edwards, who filed three motions to unseal the defendants' filings. This court reviewed the filings, concluded that they contained "matters that are predominantly personal to Kravetz and that there is no apparent justification for their general publication," and denied Edwards's motions.[1] Edwards then moved to intervene for the limited purpose of appealing this denial.

On January 30, 2013, 706 F.3d 47, the United States Court of Appeals for the First Circuit issued an opinion affirming in part and vacating in part this court's denial of Edwards's motion to unseal.[2] The First Circuit concluded that both the sentencing memoranda and letters of support, whether attached to the memoranda or mailed directly to the court, were judicial records "entitled to a common law presumption of access."[3] Rather than ordering the documents unsealed, the court remanded to allow this court, in the first instance, to evaluate whether sufficient justification existed to overcome the presumption of access to any of the documents.[4] The First Circuit provided specific guidance on the types of privacy concerns sufficient to outweigh the presumption of access and emphasized a preference for redaction of sensitive materials.[5]

In light of the First Circuit's opinion, this court has undertaken a review of each sealed document. For the reasons following, this court hereby orders that the documents be UNSEALED as indicated more specifically below. The court has redacted portions of the documents where individual privacy interests outweigh the presumption of access and has in some cases concluded that entire letters shall remained sealed. In keeping with the First Circuit's mandate, this court has provided specific reasons justifying redaction.

■■■■ This court hereby orders that:

1. Petitioner Edwards's *Motion to Intervene* [# 123] for the limited purpose of appeal is ALLOWED.

2. Defendant Kravetz's *Sentencing Memorandum* [# 77] is UNSEALED AS REDACTED by the court. Certain sections of the memorandum contain discussions of Kravetz's medical history, symptoms, past mental health treatment, and the effect of her medical history on friends and family. The

---

1. Order, Apr. 4, 2011 [# 119].

2. *United States v. Kravetz*, 706 F.3d 47 (1st Cir.2013).

3. *Id.* at 56.

4. *Id.* at 61.

5. *See generally id.* at 61–64 (evaluating privacy concerns and encouraging redaction).

court concludes that Kravetz's privacy interest in her medical information outweighs the presumption of access, and these matters are redacted.[6] Additionally, the court has redacted the names of certain individuals whose letters of support the court has concluded should remain sealed for reasons outlined below. The court has also redacted the identities of Kravetz's partner and children as irrelevant, relating to "family affairs," [7] and having "no direct bearing upon the public's assessment of the sentences imposed." [8] Finally, portions of the memorandum describe instances of family members' illnesses. Kravetz's family members have compelling privacy interests in these "highly personal" matters,[9] and the court has accordingly redacted them.

3. Defendant Kravetz's letters of support [# 77–1] are UNSEALED as follows:

   A. Serrano's letter is UNSEALED AS REDACTED by the court. The court has redacted sections detailing Kravetz's medical treatment.[10]

   B. The second letter of support is SEALED. This letter includes detailed discussion of a family member's ill health and Kravetz's own medical history. The individuals' personal privacy interests outweigh the presumption of public access.[11]

Because the vast majority of the letter contains information properly sealed, redaction is not feasible.

   C. The third letter of support is UNSEALED AS REDACTED by the court. The letter contains the identities of minor children and descriptions of family affairs with "no public ramifications." [12] The court concludes that redacting these sections and withholding the identity of the author properly balances the public and private interests and allows for the greatest disclosure of the letter's relevant content.[13]

   D. Flynn's letter is UNSEALED.

   E. Lenore Kravetz's letter is UNSEALED AS REDACTED by the court. The court has redacted a discussion of private family affairs.

   F. Norman Kravetz's letter is UNSEALED AS REDACTED by the court. The court has redacted discussions of private family affairs and family members' illnesses.[14]

   G. Arth's letter is UNSEALED.

   H. The eighth letter of support is SEALED. The letter deals predominantly with family affairs, unverified information, and subjective remarks about medical history. This court concludes that the individual privacy interests outweigh

---

6. *Id.* at 63 ("Medical information is ... 'universally presumed to be private, not public.'" (quoting *In re Boston Herald*, 321 F.3d 174, 190 (1st Cir.2003))).

7. *Id.* at 62 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir.1995)).

8. *Id.* (leaving the district court to determine whether "the balance of interests justifies withholding from the public the identity of the authors").

9. *Id.*

10. *Id.* at 63.

11. *Id.* at 62–63.

12. *Id.* at 62 (quoting *Amodeo*, 71 F.3d at 1051).

13. *Id.* at 62–63 (leaving the appropriate remedy to the discretion of the trial court).

14. *Id.* at 62.

the presumption of access.[15] Because the vast majority of the letter contains information properly sealed, redaction is not feasible.

4. Defendant Levitin's letter of support [# 80] is UNSEALED.

5. Defendant Levitin's *Sentencing Memorandum* [# 95] is UNSEALED AS REDACTED by the court. The court has redacted significant portions of the memorandum. These portions detail incidents of domestic violence and other domestic relations affairs. Some portions discuss individuals' sexual orientation and practices. In total, these incidents risk misuse "to gratify private spite[,] promote public scandal," [16] or fuel "personal vendettas." [17] The personal privacy interests at stake outweigh the presumption of public access.[18]

Additionally, the court has redacted substantial information about the health and well-being of third parties and Defendant Levitin. Although Levitin discussed some of his medical conditions in open court at his sentencing,[19] the court concludes that these references did not waive his privacy interest in his medical information.[20] The memorandum provides significantly more detail than he revealed during the hearing. Levitin has a continuing privacy interest in his medical information that outweighs the presumption of access.[21]

6. Defendant Levitin's letters of support [# 95, Exs. 1–45] are UNSEALED as follows:

A. Exhibits 1–3 are UNSEALED AS REDACTED by the court. The court has redacted excerpts referencing individuals' sexual orientation and practices, unverified medical information, incidents of domestic violence, and the medical history of third parties.[22]

B. Exhibit 4 is SEALED. Because this entire letter discusses incidents of domestic violence, redaction is not appropriate.[23]

C. Exhibit 5 is UNSEALED.

D. Exhibits 6–10 are SEALED. These exhibits contain letters from Levitin's medical providers, including detailed medical testing information. This information is presumptively private, and Levitin did not waive his privacy interest through his disclosures at sentencing.[24]

E. Exhibits 11–20 are UNSEALED.

F. Exhibit 21 is UNSEALED AS REDACTED by the court. The court has redacted materials relating to third parties' domestic matters.[25]

---

15. *Id.* at 62–63; *Amodeo*, 71 F.3d at 1051.

16. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (internal quotations and citations omitted).

17. *Amodeo*, 71 F.3d at 1051.

18. *See id.*

19. Sentencing Tr. 18, 20, 23, Nov. 15, 2010 [# 132].

20. *Kravetz*, 706 F.3d at 63(questioning whether Levitin's privacy claim "may lose some force in light of his prior publication of the information that he now seeks to protect").

21. *Id.*

22. *Id.* at 62–63.

23. *Id.* (leaving the appropriate remedy to the district court).

24. *Id.* at 63.

25. *Id.* at 62 ("[W]e note that some of the letters contain discussion of the ill health of members of the authors' families, incidents of

G. Exhibits 22–26 are UNSEALED.

H. Exhibit 27 is UNSEALED AS REDACTED by the court. The court has redacted materials relating to third parties' domestic matters.[26]

I. Exhibits 28–29 are UNSEALED.

J. Exhibit 30 is UNSEALED AS REDACTED by the court. The court has redacted materials relating to the domestic matters and medical history of third parties.[27]

K. Exhibits 31–35 are UNSEALED.

L. Exhibits 36–37 are UNSEALED AS REDACTED by the court. The court has redacted materials relating to third parties' domestic matters.[28]

M. Exhibits 38–45 are UNSEALED.

IT IS SO ORDERED. THIS CASE IS CLOSED.

REDACTED

UNDER SEAL *E–Government Act of 2002*

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

CAROLYN KRAVETZ

CRIMINAL NO: 08–10251–JLT

## DEFENDANT'S SENTENCING MEMORANDUM And MOTION FOR DOWNWARD VARIANCE

### Introduction

Defendant Carolyn Kravetz, through counsel, respectfully submits this Sentencing Memorandum and Motion for a variance from the advisory guideline in connection with her sentencing by this Court on June 2, 2010. Ms. Kravetz pleaded guilty on February 18, 2010 to six counts of mail fraud in violation of Title 18 U.S.C. § 1341, and two counts of subscribing to false income tax returns in violation of Title 26 U.S.C. § 7206(1); she is also charged in a forfeiture count pursuant to Title 18 U.S.C. § 981 and Title 28 U.S.C. § 2461(c).

Although the offense occurred in the District of Massachusetts, Ms. Kravetz has been living and working in San Ramon, California for the past four years. Immediately following the return of the federal indictment on 8/28/2009, she was arrested in California on 8/28/2009, waived a removal hearing and was released on $20,000 unsecured bond with conditions. Ms. Kravetz has complied with her pretrial reporting conditions at the Oakland Pretrial Services office.

The defendant wasted no time in bringing this case to a conclusion. She has paid all taxes due and owing, including interest and penalties, and has entered into an agreement with the government regarding forfeiture. Her codefendant has paid the restitution in full. Ms. Kravetz asks the Court to sentence her to thirty six months probation with a special condition that the first six months be spent on electronic monitoring, that she continue in mental health treatment, and that she not be permitted to work in a capacity that gives her the authority to disperse funds.

The advisory guidelines must be considered in every sentence. The First Circuit

---

domestic violence, and other domestic relations matters. This information is highly personal and appears to have no direct bearing upon the public's assessment of the sentences imposed.'').

26. *Id.*

27. *Id.*

28. *Id.*

has indicated that a sentencing judge should consider other factors that might make a sentence outside of the guideline range appropriate. Those factors are enumerated at 18 U.S.C. § 3553(a). *U.S. v. Jimenez–Beltre*, 440 F.3d 514, 518–19 (1st Cir.2006)(en banc). The defendant believes the advisory guidelines are, in her case, more onerous than need be. A variance in this case would be more appropriate.

### The Advisory Guidelines

The defendant entered into a plea agreement with the government in which Kravetz expressly and unequivocally admits her guilt in committing mail fraud and income tax evasion. Both parties agreed that the advisory guidelines, after acceptance of responsibility, would result in a level 19, CHC II, guideline range 33–41 months. The government agreed to recommend a period of incarceration of 32 months. The defendant reserved the right to argue for departure from the advisory guideline or a sentence outside the guidelines pursuant to the provisions of 18 U.S.C. § 3553(a).

Notwithstanding the plea agreement, the Presentence Report calculates the advisory guidelines higher, at level 20, CHC II for a range of 37–46 months.

Ms. Kravetz argues for a departure from the advisory guidelines. As outlined in her objections to the Presentence Report, the defendant asserts that her Criminal History overstates the seriousness of her past behavior, inasmuch as the prior offense of February 2004 and the instant offense which began six months later in August, 2004 actually constitute a single episode of behavior uncharacteristic of Ms. Kravetz' otherwise exemplary life. The two offenses are the result of an ongoing period of depression and confusion for which she was undergoing mental health treatment with psychopharmacologic drugs. The state offense of February 2004 was continued without a finding and ultimately dismissed. Because the instant offense occurred during the period of the CWOF, Ms. Kravetz was assessed two more criminal history points, placing her in a Criminal History Category II.

The defendant asks this court to consider that a more appropriate advisory guideline level for Kravetz would be Level 19, CHC I, guideline range 30–37 months.

Although district courts were always expected to consider statutory factors at 3553(a), judges generally accepted that those factors were adequately considered by the Sentencing Commission. Even as the 3553(a) factors were often at odds with the then mandatory guidelines, appellate courts for the most part considered the supremacy of the guidelines over other factors. Much has changed in the emphasis that guidelines are now afforded. The defendant asks your honor to consider that even the advisory guideline range suggested by the defendant's guideline departure is greater than necessary to meet the purposes of the sentence. In considering the Supreme Court's mandate that in addition to considering the final advisory guideline calculation, the sentencing court must consider the statutory sentencing factors at 18 U.S.C. § 3553(a), *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

### Nature and Circumstances of the Offense

Carolyn Kravetz agrees with the government's version of the offense. The defendant met her co-defendant, Boris Levitin, while both attended Boston University; Kravetz received her Bachelor's degree in 1988.

In the fall of 2003, Kravetz began experiencing emotional difficulties, anxiety at-

tacks, extreme exhaustion, not eating. [redacted]

It was during this period [redacted] in February, 2004, that Kravetz' total offense history began when she stole a credit card from a neighbor's apartment. She used the card to purchase expensive shoes and clothing, none of which she needed or could not afford to buy on her own; the clothing still had the store tags attached at the time of her arrest. At the time of that offense, Kravetz was a full-time student pursuing a Master's degree at Harvard University. She supported herself by refinancing her mortgage and living on savings. Prior to entering the Harvard program, the defendant had been earning good money at her job as Vice President of the Corporate Communications Department at Arnold Worldwide. She was always a saver and earned $107,500 when she was laid off from that position in December 2001. *PSR ¶ 97.* While employed at Arnold Worldwide, Kravetz subcontracted with her former classmate, Boris Levitin's company to perform graphic design projects. Kravetz and Levitin had worked together at WGBH TV some years earlier, and Kravetz knew of Levitin's abilities.

When the Brookline police executed a search warrant of Kravetz's apartment, they confiscated a laptop that Levitin had stolen from WGBH after Levitin was terminated from his job. Kravetz appeared in Brookline District Court in January, 2005 and admitted responsibility for the stolen credit card. Her case was continued without a finding and she was ordered to perform 20 hours of community service. The case was dismissed in July, 2006.

Six months after the Brookline offense began, in August, 2004, Kravetz continued her self-destructive behavior with co-defendant, Boris Levitin. Kravetz had suc-

cessfully earned an MA from Harvard in Public Administration in June 2004. She immediately parlayed the degree into a well-paying job as Director of Global Communications for Dunkin' Brands at a salary of $120,000. Incomprehensibly, she used her position at Dunkin' to subcontract with Levitin's company, Luminophore. It is unclear when Kravetz actually subcontracted with Luminophore. She had begun work at Dunkin' Brands in May 2004 and the offense conduct began in August 2004. Kravetz took kickbacks from Levitin. She authorized payments to Levitin that totaled $396,875 over a period of 14 months. (8/2004–10/2005). The defendant approved invoices for work that was not finished and Levitin kicked back to Kravetz a total $198,437.50. Again, there was no financial need for Kravetz to get kickbacks. She did not live lavishly and deposited the funds into her own bank account or her Fidelity account.

In preparing her own income tax returns for offense years, 2004 and 2005, Kravetz neglected to identify the additional income she received from the mail fraud offense. The federal government and state of Massachusetts sustained a total tax loss of $81,309.[1] The defendant has since filed amended tax returns, paid all taxes due and owing including interest and penalties.

Ms. Kravetz is horrified at the full realization of her criminal acts. Since she resigned from Dunkin Brands, she has completely changed her life and has been living a productive and crime free for the past four years in California. Even five years since the end of the offense period, Kravetz continues to be extremely remorseful for her behavior and the pain it has caused her family and friends, not to mention her former employer. She can

---

1. The plea agreement considered the tax loss to be less than $80,000.

now fully appreciate the extent of her mental health issues and is committed to making amends for her behavior. She understands the value of maintaining good mental health and undergoing the treatment she needs to keep her life in perspective.

### History and Characteristics of Carolyn Kravetz

Carolyn Kravetz, presently 44 years old, was born in Lynn and reared in the prosperous towns of Lynnfield and Peabody, along with her parents and two older sisters. The father owned a print shop where both he and Mrs. Kravetz spent their days working. The family lived in harmony enjoying the fruits of the parents' labors with warm and close relationships, family vacations, and a respectful regard for each other. The defendant enjoyed the comfort and emotional support of her family during her early and teenaged years. Effortlessly, she did everything her parents expected of her—thriving at school, becoming a member of Honor Society, earning above-average grades, participating in extra-curricular activities, and learning the value of hard work. As children, Carolyn and her sister, [redacted] shared a paper route for many years. [redacted]

True to form, Kravetz left the family home when she entered Boston University in 1984 and continued on the path toward success, graduating from BU in 1988 with above-average grades. It was there that she met her co-defendant, Boris Levitin. The nature of their relationship is unclear, but they had an attraction for each other on several levels. One level led both of them into the criminal justice system.

On graduating, Ms. Kravetz set about to work in the media, at Boston's channel 5 and Public Broadcasting Company's WGBH in Boston, where Boris Levitin also worked for a time before he was fired.

Perhaps the experience of life in Boston's urban environment with a more diverse population opened avenues of exploration for Ms. Kravetz that her rather sheltered and comfortable life had left undeveloped. Ms. Kravetz gained a sense that she needed to do something for the community. Her father reports that she "spent time to help improve the lives of those less fortunate than herself. During her tenure at Channel 5 she helped organize several public service campaigns. One in particular was Project Shelter. The goal of Project Shelter was to create an awareness about and raise funds for services that support the homeless. During the two-year campaign Carolyn spent countless hours getting to know homeless shelter directors and the families using the facilities in order to garner a deeper understanding of how families lose everything. In each of those years, after stopping by our house for a quick visit in the morning, she'd go off to spend the rest of Thanksgiving Day volunteering at a shelter in the Boston area." She managed another project while working on the Volkswagen account at Arnold Worldwide. "Carolyn managed a year-long cross-country torch relay to raise awareness about and renew legislative support for the tenth anniversary of the Americans with Disabilities Act." *Norman Kravetz letter appended.* These projects whetted her appetite to better understand the government's role in working with non-profits and the private sector. To that end, in September 2003, Kravetz enrolled in Harvard University's Kennedy School toward a Master's degree in Public Administration.

Carolyn Kravetz has always shared a bond with her two older sisters. Her sister, considers Carolyn as an ally and best friend. [redacted] She writes: "Over the last nearly twenty years, Carolyn has been a stalwart contributor to every organization where I have worked. Because these

have been small organizations with little money in their budgets for promotion, she was always volunteered her time to help each and every one of them develop a unique, cogent marketing or press plan to augment their ticket sales and attract funding." [redacted] *letter appended.*

[redacted] goes on to say that her sister has spent much of her life contributing positively, including tutoring math for her and her partner's kindergarten class, collecting food for the homeless shelter, or helping a neighbor with a resume. [redacted] *letter appended.*

In spite of her success in securing her Masters' degree, as well as securing responsible and good paying jobs, Carolyn Kravetz' emotional life was falling apart.

[redacted]

[redacted]

[redacted]

[redacted] That connection has been restored with Carolyn's involvement in therapy. "Over the past 18 months, Carolyn has been examining her past behavior in intensive therapy and certainly has great remorse for any wrongdoing in which she may have been involved. Given my close relationship with Carolyn, I can say with sincerity that this experience has left her emotionally fragile and I fear for her well-being." *Id.* [redacted]

Since the offense cycle ended in October 2005, Ms. Kravetz realized she needed to get her emotional life under control. In October 2006, she moved to San Ramon, California and set about to make a new life for herself. She secured an apartment and several interim jobs. Ultimately, in June 2007, she secured a job as a high level employee of a Consumer Technology Group, A & R Edleman, Inc., earning $180,000 per year. She supervised nine people in the Marketing department, but had to leave this position in February 2010, when the company learned of her criminal charges. She worked at A & R Edleman for nearly three years with no blemishes on her record. Clearly, the family and job stability enabled Kravetz to enjoy a period of quietude from her emotional problems.

Since the fall of 2006, the defendant has maintained a relationship with [redacted] The couple has been living together for nearly four years and the defendant functions much as a mother to the two children, while sharing expenses with [redacted] However, since the defendant left her job at A & R Edleman, the couple has had to change their routine and economize. The defendant has taken over most of the childcare duties, feeding the children breakfast, making lunches and helping the children with their homework after school. In addition, Ms Kravetz regularly volunteers at the children's school, in reading, math, and field trips. *See Candice Arth letter appended.*

The defendant had also found time to volunteer for the non-profit Foundation, One Love, which leads humanitarian trips to areas in need of disaster relief, both domestically and abroad. Stephanie Flynn, founder of One Love, writes: "I would not have achieved [success] if it were not for Carolyn's help. She not only volunteered her expertise and extensive knowledge to help get this very important project off the ground, but most importantly, she consistently and continually volunteers her time. I know what Carolyn's schedule had been like prior to losing her job between carrying on a full-time job, caring for and helping to raise two small children and volunteering in their classrooms. Despite her already full schedule, Carolyn offered me an extensive amount of time and ideas that helped my organization thrive." *Stephanie Flynn letter appended.*

Carolyn's partner, [redacted] writes: "Carolyn is a huge part of our family and supportive in every way . . . she gets them ready each morning feeding them a warm and healthy breakfast, sends them to school having made their lunches and is the one they come home to each afternoon to start homework. Because of Carolyn, I have time to concentrate on building my business as well as going back to school to pursue the degree I long for knowing that the girls are in a safe and loving environment." [redacted] *letter appended.* Clearly, life would dramatically change for [redacted] in the event Carolyn would be unavailable to care for the children. [redacted] has been attending law school classes in addition to running her business. [redacted] lated to the Probation Officer that Kravetz has been extremely depressed and emotionally fragile since her arrest two years ago. Perhaps with some suicidal thoughts, Kravetz had been hoarding medication. Although [redacted] no longer believes that Kravetz is suicidal, she is, nevertheless, extremely emotional and fragile. *PSR ¶ 78* Ms. Kravetz understands that her loved ones have concern for her mental stability. She advised the Probation Officer, that she would never try to hurt herself, noting that she has too much responsibility to her family. It is her family and loved ones who sustain her. *PSR¶ 79.*

[redacted]

**Meeting the Purposes of this Sentence**

This Court knows well the statutes and the recent case law on sentencing. Congress delineated the goals of sentencing in 18 U.S.C. § 3553(a), and required courts to craft a criminal defendant's sentence in light of these policy directives. The overarching directive is the need to impose a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing. 18 U.S.C. § 3553(a).

These purposes include the need to reflect on the seriousness of the offense, promote respect for the law, provide just punishment, create adequate deterrence, protect the public from future crimes of the defendant, and provide the defendant with necessary treatment and training. 18 U.S.C. § 3553(a).

Most recently, the Supreme Court decided that life without parole for juveniles in non-homicide cases is unconstitutional. *Graham v. Florida,* 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). In constructing the decision, the Court considered the purposes of sentencing that apply to all sentences. With regard to retribution, the Court cited approvingly, *Tison,* 481 U.S., at 149, 107 S.Ct. 1676, the proposition that "[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Graham,* 130 S.Ct. at 2028. Carolyn Kravetz asks this Court to consider her personal culpability in light of her unstable emotional state as well as her profound remorse and efforts at paying her taxes, penalties and forfeiture amount. *Graham* makes another point relevant to Ms. Kravetz's case "Even if the punishment has some connection to a valid penological goal, it must be shown that the punishment is not grossly disproportionate in light of the justification offered." *Id.* at 2029. One of the goals for incarcerating Ms. Kravetz would be deterrence. But of course, general deterrence has not been effective since fraud and tax evasion continue unabated in spite of the hefty sentences meted out over the past ten years. In the end, the only real concern in Ms. Kravetz' case is specific deterrence and protection of the public, that is, an assurance that she will not recidivate. There is no question that Ms. Kravetz is not a violent person and poses no such threat to anyone. While recidi-

vism remains a legitimate concern, two safeguards can be put in place to ensure that Ms. Kravetz will continue with the personally productive life she has chosen. First, it would be important for her to continue in mental health treatment. The facts of her offense and personal history describe a behavior that is truly aberrant. The motivation for her crime can only be explained by her disturbed mental condition for the two-year period involving the offenses. In contrast, during most of her life, Kravetz showed a generosity of spirit by participating in charitable events and contributing to other causes. The facts as demonstrated in the Presentence Report and letters submitted to this court by people who know her well, bespeak of this criminal behavior as completely out of character. Continued mental health treatment should ensure that Ms. Kravetz maintains a balanced mental state. Second, a special condition of supervision that encourages Ms. Kravetz to work, but not in a position where she has control over dispersing funds.

Finally, the Court should consider other cases similarly situated to avoid any unwarranted disparity in sentencing Ms. Kravetz. A review of the Federal Defender's data bank on sentences in this district reveals three post-Gall/Kimbrough Fraud cases with discounts from 9% to 60%. A review of Pre–Gall/Kimbrough Fraud cases reveals eight cases in the data base with discounts ranging from 24% to 52%.[2] Not surprisingly, even when the guidelines were mandatory, judges in this district sentenced according to the statute with guidelines playing an important role.

On a national level, the Sentencing Commission's data report for Fiscal 2008, shows the Median Percent Decrease From GuideKne Minimum in Fraud cases to be 64.6% and the Median sentence for Fraud cases was 5 months. For Tax cases, the Percent Decrease was 100% and the median sentence was zero.[3] *See Attached Table 8.*

In a 1998 D/Ma case of embezzlement and tax evasion, Alfredo Ribot, CR 98–10061–NG, was charged with taking $193,092 from his employer. Tax evasion charges related to the embezzlement. Ribot had a guideline level 17, CHC I. Ribot was sentenced to 36 months probation with a special condition of home detention with electronic monitoring, participation in substance abuse and mental health treatment, and restitution in the amount of $193,092. The Presentence Report actually calculated the fraud loss at $599,893, but the judge found no factual basis for increasing the loss amount. Ribot, unlike Kravetz, had a legacy of family abuse which Ribot surmounted with the help of large amounts of alcohol. In spite of his alcoholism and major depression, Ribot, like Kravetz, worked hard in contributing voluntary service to the community. Like Kravetz, Ribot exhibited suicidal tendencies but he actually did make an attempt on his life. Judge Gertner found the guidelines excessive. Even in the mandatory guideline era, Judge Gertner concluded that "the appropriate sentence is one that enables Ribot to continue his treatment." With regard to the argument that the Bureau of Prisons has programs adequate to the task of addressing Ribot's problems, J. Gertner wrote: "Any imprisonment necessarily

---

**2.** Federal Defenders Website collection of D/MA sentencing decisions. It is possible that not all sentences have been included in the Defender's website.

**3.** U.S. Sentencing Commission: Post-*Kimbrough/Gall* Data Report, Fiscal 2008 *Downward Departures From Guideline Range: Degree of Decrease for Offenders in Each Primary Offense Category* Table 8

means interrupting any treatment—a period prior to classification (6–12 weeks, perhaps), then classification, and finally, treatment. Imprisonment means interrupting this particular treatment plan, one which seems to offer hope ... Furthermore, all psychiatrists describe Ribot as extremely fragile and vulnerable at this time, and warn against the consequences of imprisonment ..." *U.S. v. Ribot,* 97 F.Supp.2d 74, 75, 77, 84—Dist.Court, D

Ms. Kravetz asks the Court to sentence her in accordance with Ribot's sentence. Justice Stevens quoted the District Judge's conclusion in *Gall* that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing" In *Gall* as here, a sentence of incarceration would do nothing to promote respect for the law, especially in view of Ms. Kravetz' remorse and the repayment of the economic harm.

All things considered, a probation term of 36 months with a special condition of six months home confinement will enable Ms. Kravetz to continue with her mental health treatment, care for her partner's children, and carry on her voluntary service. Eventually, Ms. Kravetz may find a job, as long as she is not tempted by the ability to disperse funds.

Respectfully Submitted,

Carolyn Kravetz,

By her Counsel,

*//Joseph J. Balliro, Sr.*

Joseph J. Balliro, Sr., Esquire

Balliro & Mondano

63 Atlantic Avenue

3rd Floor

Boston MA 02110

(617) 737–8442

BBO # 028000

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on May 26, 2010.

*/s/Joseph J. Balliro, Jr.*

Joseph J. Balliro, Jr.

### Certification

Counsel certifies that he has complied with the mandates of the *Policy of the Judicial Conference of the United States and the E–Government Act of 2002* by minimizing personal data content in this submission and attachments and by captioning this Memorandum as *Under Seal.*

*/s/Joseph J. Balliro, Jr.*

Joseph J. Balliro, Jr.

# SHARPER ▲ FUTURE

SOCIAL HABILITATION AND RELAPSE PREVENTION - EXPERT RESOURCES
A Division of Pacific Forensic Psychology Associates, Incorporated

March 3, 2010

March 3, 2010

Mr. Joe Balliro

65 Chole Court

Barnstable, MA 02630

Mr. Balliro:

This letter is to confirm that Ms. Carolyn Kravez has been attending weekly mental health counseling through our agency over the past year Ms. Kravetz was referred to Sharper Future by Federal Pretrial services in order to help her manage [redacted] related to her current legal situation Ms. Kravetz has been extremely cooperative and fully engaged in the therapeutic process. [redacted] This recommendation was approved. Please feel free to contact me directly at [redacted] you should have any further questions.

Sincerely.

Kristina Serrano, LMFT

The Honorable Joseph L. Tauro:

Dear Judge Tauro:

[redacted]

Carolyn is a huge part of our family and supportive in every way. [redacted] Because of Carolyn I have time to concentrate on building my business as well as going back to school to pursue the degree I long for [redacted] Carolyn is a very generous, throughout warm and giving person. I have witnessed on many occasions her willingness to help others in different situations. She volunteers at the kid's school, she has volunteered at local charities and has offered her knowledge and expertise to friends who have lost jobs or are looking for job changes.

Unbeknownst to many, for the past 18 months Carolyn has been living in her own prison. I do not believe there is a minute that goes by without her thoughts and acknowledgement of the mistakes she has made I know that she is remorseful and we talk often about her regret in judgment. [redacted] than two hours of sleep at any one time and is very scared about her future.

My hope is that you see Carolyn for the person she is outside of this mistake. Carolyn has so many wonderful things to offer not only our family but our community and society in general—she is a good person.

Judge Tauro, please consider probation and or public service as opposed to incarceration for Carolyn. [redacted] we need her in our lives, we need her our home.

Respectfully,

[redacted]

May 13, 2010

The Honorable Joseph L. Tauro:

Dear Judge Tauro,

I am writing on behalf of my colleague and friend, Carolyn Kravetz.

I first met Carolyn four years ago through mutual colleagues. Since then I've been able to spend a good deal of time with Carolyn and get to know her well as she has been volunteering at my non-profit organization, One Love International.

I welcome the opportunity to speak on Carolyn's behalf as it is not very often that someone volunteers her time to the extent that Carolyn has. Three years ago the industry that I worked in took a downturn; I lost my job and my home as a result. At this point I decided to pursue my lifetime dream of starring a humanitarian non-profit organization. Carolyn was extremely supportive spending countless hours sharing her knowledge of launching and running a 501(c)(3) organization. Having spent several years deeply involved with the New England Chapter of the Ronald McDonald House Children's Charities and five years spent working on public service projects at WCVB–TV in Boston, her first-

hand knowledge of this type of organization has been invaluable to me.

Starting One Love International—which leads humanitarian trips to areas in need of disaster relief both domestically and abroad—has been a long process; and one which I would not have achieved if it were not for Carolyn's help. She not only volunteered her expertise and extensive knowledge to help get this very important project off the ground, but most importantly, she consistently and continually volunteers her time. I know what Carolyn's schedule had been like prior to losing her job between carrying on a full-time job, caring for and helping to raise two small children and volunteering in their classrooms. Despite her already full schedule Carolyn offered me an extensive amount of time and ideas that helped my organization thrive.

If I had to sum up Carolyn's motivation for all that she does to help me and others, it is that she *cares*, Carolyn cares that One Love International is successful. She is personally interested in seeing me succeed. More importantly, Carolyn cares about the people who may be positively impacted by an organization such as the one she helped me create. I know if she had a valid passport and permission to travel she would be anxious to participate on the ground.

Judge Tauro, no one is more aware of the mistakes she has made than Carolyn herself. We talk often and one thing that is very apparent to me is the regret she feels for her actions which led to this case. My hope and prayer is that you will offer her an alternative to incarceration. This is a woman with much to offer and she does so unselfishly.

I respectfully thank you for your time and consideration and for the opportunity to speak on my dear friend's behalf.

Sincerely,

Stephanie Flynn

Executive Director

One Love International

Stephanie Flynn Founder and Executive Director 22751 El

Prado # 8208 Rancho Santa Margarita, CA 92688

[redacted]

[redacted]

Leonore Kravetz

[redacted]

Plymouth, MA 02360

[redacted]

The Honorable Joseph L. Tauro

United States District Court

1 Courthouse Square, Suite 2106

Boston, MA, 02216

Dear Judge Tauro,

I would like to introduce myself, I am Carolyn Kravetz's mother, Lenore Kravetz, and I am proud of it [redacted]

[redacted]

Carolyn has shown a focus for whatever she undertakes. Her upward mobility in the work environment certainly indicates this. In 2002, while holding a position as Vice-president at a large Boston advertising agency, Carolyn decided to return to school. She applied to and was accepted at the Kennedy School at Harvard University where she received her advanced degree in Public Policy in June 2004. For Carolyn, the experience at the Kennedy School was enlightening from both an academic and personal prospective.

Carolyn is wonderful with children, animals and the less fortunate. She has been concerned about the homeless; the less

advantaged and about abandoned animals. She has contributed to this end with food, clothing and other necessities. She has volunteered her time at food shelters and at other non-profit agencies.

Carolyn is a caring and loving individual who I feel will continue to make a positive and meaningful contribution to society.

Carolyn is extremely remorseful concerning the past and knows that nothing she can do today will change that; however she is taking responsibility for it and is optimistically turning toward the future.

I love her with all my heart and soul, pray for her daily and feel that all will turn out in a positive way.

Sincerely.

Leonore Kravetz

[redacted]

[redacted]

### Norman M. Kravetz

[redacted]

### Plymouth 02360

[redacted]

The Honorable Joseph L. Tauro

United States District Court

1 Courthouse Way, Suite 2306

Boston, MA 02216

Dear Judge Tauro,

I have known Carolyn Kravetz since birth. In time, that represents 44 years, I am the father of the sophisticated, energetic, extremely bright, well-educated woman. Carolyn Kravetz.

As a parent and more specifically as her father. I would like to say that, "I am proud that Carolyn is my daughter." To reflect upon what Carolyn has accomplished in her professional life is only a dream for some parents, however for me it is reality.

[redacted]

[redacted] Add to the above, her accomplishments in the work place and yet can see why I am as proud as I am of Carolyn.

For a parent to see their child's name appear in the credits, on screen, after the 11 o'clock news is in the Jewish faith, *"nachos"* (*meaning: pleasure or joy*). The reality is that as Director of Public Relations at WCVB–TV, (*Channel 5* ), her mime did appear. For me, to see her name quoted in the media as the spokesperson for McDonald's, Volkswagen, Dunkin Donuts or Staples serves as a reward for the effort we expended to raise Carolyn. As a professional woman, Carolyn is, I think, the best in her field.

What is not obvious on Carolyn's professional resume' are the contributions she made behind the scenes, alter working hours, on weekends and during vacations. That's the time Carolyn spent volunteering her time to help improve the lives of those less fortunate than herself. During her tenure at *Channel 5,* she helped organize several public service campaigns. One in particular was *Project Shelter.* The goal of *Project Shelter* was to create awareness about and raise funds for services that support the homeless. During the two-year campaign Carolyn spent countless hours getting to know homeless shelter directors and the families using the facilities in order to garner a deeper understanding of how families lose everything. In each of those years, after stopping by our house for a quick visit in the morning, she would go off to spend the rest of Thanksgiving Day volunteering sit a shelter in the Boston area. While working on the Volkswagen account at *Arnold Worldwide* Carolyn managed a year-long, cross-country torch relay to raise awareness about and renew legislative support for the

*tenth anniversary of the Americans with Disabilities Act.* This is the Carolyn that has the compassion and the desire to help others in need. These experiences drove Carolyn's desire to attend the Kennedy School of Government at Harvard University to learn how to better understand the ways in which government, non-profits and the private sector could work together to build a better society.

[redacted]

What words does one use to describe Carolyn's persona? Words that come to mind are; kind, generous, considerate, un-selfish, pretty, and caring. If I were to consult Webster's dictionary of the English language, I could possibly come up with hundreds more.

[redacted]

[redacted]

Carolyn is the third generation of the Kravetz family to attend college, the second generation to have attended graduate school (*Kennedy School of Government at Harvard University, class of "04"*) and she possesses a resume' of accomplishments that make her mother and me proud to say . . . "She is our daughter."

Sincerely.

Norman M. Kravetz

### San Ramon Valley Unified School District

*Coyote Creek Elementary School*

[redacted]

San Ramon, CA 94582

May 18, 2010

Candice Arth

[redacted]

San Ramon, CA

94583

The Honorable Joseph L. Tauro:

Dear Judge Tauro,

I have had the pleasure of working with Carolyn Kravetz for two years, as she volunteered in my kindergarten classroom last year during our weekly reading learning center, and now this year in my first grade classroom during oar weekly math tutoring center. In the time I have known her, she has brought a dedicated spirit to my classroom, my students, and to our school's learning community.

I wish all my classroom volunteers were as effective and reliable as Carolyn has proven to be. I greatly appreciate the fact that she has always helped maintain my established routines and procedures, while providing the necessary support and guidance for all my student's diverse learning needs. She works effectively with my students as she encourages them to become problem-solvers, which makes the subject matter more meaningful to them. Her positive support, communication, and praise on my student's effort, hard work, and ability provide another benefit as they grow in their self-concept as well.

Carolyn's contribution to my classroom and my students does not stop with weekly tutoring. She does home preparation for many of my class projects, volunteers for field trip driving and chaperone responsibility, and provides donations for many of my classroom needs.

Carolyn is a caring and dedicated person who involves herself in student learning and in our whole school community. She contributes time, effort, and money to school activities, helping to successfully promote Coyote Creek's vision statement, values, life skills awareness, and the strengthening of our school and home partnership.

During the two years I have know Carolyn, all her contributions to my classroom

as well as our school have been immeasurable in the success of my students and in the success of our whole school community.

Sincerely,

Candice Arth

REDACTED

## UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

V.

CAROLYN KRAVETZ, and BORIS LEVITIN, Defendants.

Criminal Action NO. 08–10251–JLT

*FILED UNDER SEAL*

### *DEFENDANT BORIS LEVITIN'S SENTENCING MEMORANDUM*

#### *INTRODUCTION*

Boris Levitin does not come before this Court to sugarcoat or make excuses for his crimes. Rather, as his guilty plea illustrates, Levitin deeply regrets and accepts unconditional blame for the serious fraud offenses of which he stands convicted.

But if any defendant deserves a non-custodial sentence—by downward departure or variance from his advisory Guidelines range (21–27 months)—then surely Levitin does. A virtual poster child for expanded sentencing discretion after *U.S. v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), Levitin is a most unusual fraud offender. We base this char-

acterization on a unique combination of factors outlined in the Presentence Report (PSR) and amplified below, including the following:

● **Extraordinary Physical Impairment** [1]

Levitin, just 45, sees a battery of doctors, visits a spate of hospitals, and takes a flurry of medications for a wave of debilitating ailments that will dramatically worsen in jail—ailments the Bureau of Prisons (BOP) is ill-equipped to adequately manage. Topping the list are the following:

★ uncontrolled Type II diabetes;

★ [redacted]

★ [redacted]

★ [redacted]

★ [redacted]

★ [redacted]

★ [redacted]

★ [redacted]

According to his doctors, Levitin's life expectancy is no more than 12 years, and he is at risk of heart attack, stroke, organ failure, liver cancer or even death itself. Without exaggeration, then, prison could literally kill Boris Levitin, or at least accelerate his demise.

● **Extraordinary Family Circumstances**

---

**1.** Notably, a proposed amendment to U.S.S.G. § 5H1.4 makes physical condition an encouraged departure ground—and expressly authorizes "home detention" on that basis—if present, "individually or in combination with other offender characteristics," to an "unusual degree and distinguish[ing] the case from the typical cases covered by the guidelines." So it is here. *Cf. U.S. v. Gilmore*, 599 F.3d 160 (2d Cir.2010) (court applying Guidelines in effect when offense occurred may consult amended provisions in later manual to fashion non-Guidelines sentence); 18 U.S.C. § 3553(a) (directing sentencing court to consider defendant's "history and characteristics," including need for "effective" medical care).

Born into a broken and impoverished home in Soviet Russia, Levitin was abandoned by his father as a boy and raised by an unstable and abusive mother [redacted] Indeed, Levitin does not know his mother's whereabouts even today, as he has not heard from her in years. Emigrating to Israel, Levitin was later marginalized, beaten and terrorized by neighborhood thugs, to the point where he contemplated suicide. These formative experiences left Levitin vulnerable, naive and primed for manipulation—both generally and by "psychopathic"[2] codefendant Carolyn Kravetz, the scheme's undisputed mastermind and ringleader who took full advantage when Levitin had the misfortune to fall under her sway.

- **Atypical Fraud Defendant**

How many accused swindlers embark on their schemes intending to provide the services for which they are engaged? Better yet, how many corrupt vendors actually perform substantial work for their clients, as documented in contemporaneous emails, evidenced by binders of voluminous work product, and acknowledged by the client itself in a civil settlement agreement? And, equally telling, how many fraud defendants constantly badger their contact at the client company—as contemporaneous emails further reflect—for specifications and directions needed to complete outstanding work, only to be stymied by her calculated campaign of falsehoods?

Boris Levitin did all that and more, reimbursing every cent of the $396,875 he received from Dunkin'—including the one-half share (almost $200,000) that went to Kravetz herself. While starting out with honest intentions, Levitin's terminal error—born of fear, panic and a misplaced desire to protect Kravetz—was joining her fraud in progress when it should have been obvious that she didn't share his good faith: that she never intended for the outstanding work to be finished and was bent on stealing from Dunkin'. Levitin should have known better, and his inordinately poor judgment has landed him before this Court for sentencing.

For all these reasons, discussed more fully below, the Court should exercise its post-*Booker* discretion and impose a non-custodial sentence here, via Guidelines departure or 18 U.S.C. § 3553 variance.

*LEVITIN'S TROUBLED CHILDHOOD*

Pages 8–11 of the PSR aptly describe Levitin's Dickensian upbringing, so we reference them in some detail.

1. Born an only child in 1965 Moscow, Levitin was raised by a mentally disturbed mother and malevolent grandmother. His father was largely absent, having left the family following a divorce while Levitin was *in utero*. PSR ¶¶ 31–33, 37–38, 41.

2. Soviet life was "dangerous" and the family poor, struggling for clothes and shelter, waiting in food lines and scraping by on as little as one meal a week. *Id.* ¶¶ 33–34.

3. At age seven-and-a-half, Levitin fled with his mother and grandmother to Israel, where life remained "difficult." Persecuted ethnically and religiously, Levitin was "beaten and tortured daily" by neighborhood toughs. [redacted] *Id.* ¶¶ 34–35, 63, 69.

4. [redacted] *Id.* ¶¶ 37–38.

---

**2.** 5/25/10 Ltr. of Anna Melnikova (Ex. 1), at 2.

5. Levitin and his mother came to America in 1984, living in "dangerous" New York City neighborhoods before settling in Boston [redacted] *Id.* ¶¶ 39–42.

6. [redacted] *Id.* ¶¶ 43, 46.

\* \* \*

Levitin's traumatic childhood forged a weak and dependent personality—maladjusted, insecure, emotionally needy and ripe for exploitation. Enter Carolyn Kravetz, a pathological liar and "master manipulator," creating a recipe for disaster and unleashing a perfect storm. 4/28/10 Ltr. of Karen E. Sweeney (Ex. 2), at 3.

## KRAVETZ'S TWISTED AND PREDATORY RELATIONSHIP WITH LEVITIN

Levitin and Kravetz met at Boston University in 1985, forming a perverse and dysfunctional relationship—one-sided if not sadomasochistic—that lasted over 20 years. *E.g.,* PSR ¶¶ 2, 70. They went on to work together at WGBH–TV and Arnold Worldwide Communications, Inc., where Kravetz, a communications vice president, hired Levitin as an outside graphic designer. *E.g., id.; Kravetz* Sent. Br. 5.

### Kravetz's Pathological Duplicity

Common acquaintances describe Kravetz as "wicked,"[3] treacherous and "sociopathic"[4]—"cunning, devious"[5] and "controlling,"[6] prone to emotional "blackmail[ ]"[7] and able to "deceive[ ]"[8] those around her for "long" periods of "time."[9] *See generally, e.g.,* Ex. 1 at 2 ("highly aggressive" and "extremely manipu-

lative"); Ex. 2 at 1, 3 (bullying, violent, "self-centered and conniving"); Exs. 3 & 4 (full of deceit). As one writer puts it, Kravetz "could appear nice when it was in her interests," hiding her true nature from her closest companions—[redacted] and leaving a trail of victims in her wake. Ex. 1 at 2; *accord* Ex. 3 at 3 ("she lured me in, deluded me and appeared to be nice and reassuring and in charge").

[redacted]

[redacted]

Ex. 2 at 2–3 (emphasis supplied); *accord* Ex. 4 at 1 [redacted]

[redacted]

[redacted]

Ex. 2 at 2 (emphasis supplied).

[redacted] Ex. 4 at 1.

[redacted] details the extent of Kravets's stealing and lying, explaining how she too became a victim:

While I knew [Kravetz], I learned that she was doing things out of the ordinary and illegal. She purchased mattresses, high end shoes, top of the line washer/dryer, designer rugs, a bedroom set from the finest maker, diamond earrings and then claimed to American Express or others that she never received the goods. She stole laptops, a chair and LCD projector from work. I witnessed her doing expense reports for work, where she took full advantage of the company, billing them for every personal expense she had. I went with her to shop on Newbury Street once, meeting up with her at her hair salon, where she

---

3. Ex. 2 at 1.

4. 4/22/10 Ltr. of [redacted] (Ex. 3), at 3.

5. *Ibid.* at 2.

6. *See* Ex. 1 at 1; Ex. 2 at 2; 5/25/10 Ltr. of [redacted] (Ex. 4), at 1.

7. Ex. 2 at 1–2; *accord* Ex. 1 at 1–2

8. Ex. 1 at 21 Ex. 4 at 1.

9. Ex. 1 at 2.

*put expensive bottles of shampoo in to my bag without me knowing she did not pay for [them] or that I was carrying them until hours later.* One time, when she was invited to visit my family's summer home, I found her at our neighbor's house, in their master bedroom looking in their top dresser drawer. I suspect she was looking for jewelry to take home with her as she was aware that they had ... enormous ... wealth.

*Id.* (emphasis supplied).

Indeed, Kravetz even lied to [redacted] about her own background, inventing an alternate history for herself. "On the occasions that I was with her family," [redacted] remembers, "[Kravetz] was careful to never leave me alone with anyone for fear that I would mention something about her past that she fabricated to me. Over time I learned that she did not grow up in the state she said she did, did not attend Phillips Academy; did not have the life that she told me she did." *Id.*

Kravetz's chicanery and kleptomania crested in 2004, with her arrest for—and ultimate admission to—burgling the apartment of a friend and her autistic daughter, stealing their credit cards, and charging thousands of dollars of merchandise, including expensive shoes and clothes. *See, e.g.,* Govt. Sent. Br. re Kravetz 2–4; Kravetz Sent. Br. 4–5; Ex. 3 at 2. The victimized friend, [redacted] recounts this nightmare episode and the damage it caused her and her daughter, revealing the depth of Kravetz's pathology in covering it up:

I was about to find out who Carolyn Kravetz was when she entered my apartment without my permission and stole credit cards belonging to my daughter and myself.

I did not return home to find my apartment door forced open. Carolyn had a copy of my key. . . .

[And she] was there to help. *So devious was she that she had planned for this scenario. Call the police, she said. She would talk to them about what she had observed over the weekend. I was present while she gave false information to Officer McHugh about a package she had put at my door and 'a suspicious person' she had seen.* I had to change my locks. *She just happened to have a locksmith coming over. Don't worry, she would send him up to my apartment. Did I need anything at the store?*

\*     \*     \*

I spent time and effort to straighten out the financial mess caused by the use of my credit card and dealing with the Police. . . .

Carolyn had also made fraudulent charges on my daughter's credit card[, c]harging items and having them shipped to my daughter when we were both out of town.

What Carolyn did to me was wrong, but *what she did to my daughter, [redacted] who has a disability was beyond belief and horrendous.* Carolyn knew about my daughter's condition; a form of high functioning Autism. It had taken years of struggle for [redacted] to be on her own, complete four years of college and cope with the stresses of everyday life. But she still has manifestations of Autism; mainly anxiety. *My daughter was beside herself trying to straighten out her credit card mess. Carolyn knew about the situation and even offered to contact a lawyer friend who handled cases like this, for us.*

*Even now, as I write, I find my hand trembling with fear and anger over what Carolyn Kravetz did to us.*

Ex. 3 at 1–2 (emphasis supplied); *accord* Ex. 4 at 1 ("After moving out, I ran into ... a neighbor of ours. She shared with

me that Carolyn had stolen her adult disabled daughter's credit card and ran the bill up with extravagant purchases. She was devastated.").

### *Kravetz's Long–Term Abuse and Manipulation of Levitin*

For his part, Levitin was Kravetz's opposite in virtually every significant respect. "[K]ind, generous [and] hard-working," he was known among the same mutual acquaintances as "decent" and "wonderful," Ex. 2 at 1—albeit "guileless," *id.*, "very naive and trusting," Ex. 1 at 2, and "tend[ing] to see the good in people," Ex. 2 at 2. *See also* Ex. 1 at 1 ("pleasant, well-intentioned, knowledgeable"); Ex. 2 at 1–2 (principled, intelligent and well-educated). Given these predispositions, Levitin was bound to "f[a]ll prey," Ex. 3 at 2, to Kravetz's sly ways. And fall he did, quickly finding himself "captured in her grasp," Ex. 1 at 2, and under her proverbial thumb, Kravetz "us[ing him] to her advantage whenever she needed him," Ex. 2 at 1, while cleverly keeping him "in the dark," Ex. 1 at 2, as to "who" she really "was." Ex. 3 at 1; *see also* Ex. 2 at 3 (Kravetz "fully took advantage" of Levitin's gentle nature); Ex. 3 at 1 (neighbors "would shake [t]he[i]r head[s] and say that [Levitin] was being used"); Ex. 4 at 1 (Levitin "manipulated and taken advantage of by Kravetz).

To one writer, Levitin appeared "full of love and concern, cared for [Kravetz], brought her food and gifts, always with a smile on his face." Ex. 1 at 2. In fact, he was so devoted that he gave Kravetz some $150,000 in financial support over 15 years, even buying her groceries and other household items [10]—simply because she cried poverty while earning enough to purchase "new cars for cash" and a Brookline apartment. Ex. 2 at 2. As another writer

confirms, "Boris [would] tak[e] Carolyn grocery shopping in his car, even though Carolyn had a car of her own. Boris seemed like a 'best friend,' lugging bags of things up the two flights of stairs. But after the chores were done, he would leave. What a great person to have, I thought." Ex. 3 at 1.

Yet at the same time, Kravetz took pains to "isolate" Levitin from "all her other relationships," keeping her true self carefully under wraps [redacted] Ex. 2 at 2. [redacted] thus reports that

> Carolyn presented a completely different face to Boris. . . . [She] went to great lengths to behave and act differently in front of [him]. *She told me and her other friends who knew Boris never to talk about her in front of him.* When Boris visited the apartment she had to be part of every conversation. [redacted] I don't know whether Carolyn had any positive feelings for Boris because she often badmouthed him to me behind his back. . . . But she always had the greatest respect for his intellect and his workmanship. Whenever she needed any help in her work or in her life that required these abilities, she turned to him. . . .
>
> [For these reasons, she] knew that she could not reveal her true face to Boris. . . . Because they were never lovers, he never truly saw the [dark] side of her nature. . . . It [was] an awful combination.
>
> I believe that Boris was victimized by Carolyn—she used the same tactics and strategy with me and others when she wanted something. Carolyn lied to him because she lied to everybody to get what she wanted.

Ex. 2 at 2–3 (emphasis supplied).

Still another writer shares these perceptions, telling how Kravetz once "laughed"

---

10. *See* 8/4/06 Proffer at 5.

when Levitin's "name" and "what he did for her" came up in conversation. Ex. 3 at 1. According to the writer, Kravetz said "she felt sorry" for Levitin, boasting that *"he had no idea who she was and . . . was willing to do anything for her." Id.* (emphasis supplied); *see also* Ex. 1 at 2 [redacted]

It was against this backdrop that Dunkin' hired Kravetz as a marketing director in 2004, PSR ¶ 2, setting the stage for the offense of conviction.

### LEVITIN'S OFFENSE CONDUCT

As a marketing director, Kravetz had discretionary authority to approve vendor invoice payments up to $100,000. *E.g., id.* ¶ 2; Indictment ¶ 6. The toxic mix that was Kravetz and Levitin boiled over in 2004, when, using that authority, she tapped him to provide graphic design, technical publishing and information systems services for Dunkin. *E.g.,* PSR ¶¶ 2–3.

As the government recognizes, Kravetz "mastermindt[ed]" and orchestrated every aspect of the "two-person [fraud] scheme" charged in the indictment, hatching and "control[ling]" it "from the get-go." Govt. Sent. Br. re Kravetz 4. Most pivotally, she "decided what projects would be billed," *id.,* and "instructed" Levitin—a first offender—to "pre-invoice" them before beginning the work, 8/4/06 Proffer at 2, so Dunkin' "could meet its fiscal year obligations." 7/14/08 Proffer at 1. Levitin had no apparent reason to doubt that explanation, at least initially. *Id.* at 1–2; *cf. id.* at 1 ("The projects made sense to LEVITIN and related to what he thought was going on at DUNKIN'."). In addition, Kravetz

dictated the "bill[ing] amounts," Govt. Sent. Br. re Kravetz 4, "authorized" the invoices' upfront "payment," Indictment ¶ 9, and told Levitin "what information to put for services rendered," 8/4/06 Proffer at 2.[11] Unbeknownst to Levitin, however, Kravetz was internally misrepresenting the projects to Dunkin' as " 'completed' " rather than paid in advance. *E.g.,* PSR ¶ 3.

Levitin originally accepted the assignments in good faith, intending to perform them to the best of his ability. But one of his biggest and most perplexing mistakes was succumbing to Kravetz's fee-splitting demands. *E.g.,* 8/4/06 Proffer at 3'4. Levitin rationalized the kickbacks by crediting Kravetz's assurances that they wouldn't harm Dunkin' financially:

> To justify her actions, KRAVETZ told LEVITIN on more than one occasion that DUNKIN would be charged much more for the same services if provided by other suppliers and the work would not be as good. On one occasion, referencing both the split and the incomplete work, KRAVETZ told LEVITIN words to the effect, "We are doing nothing wrong. Do you understand how much all of the other vendors would be charging for the same services?"

*Id.* at 4. Levitin also knew that, despite having shared his Arnold earnings with Kravetz, he had "completed" all assigned "work" there and still been "ridiculously" underpaid, arguably saving the company money. *Id.; cf.* 7/14/08 Proffer at 1 ("LEVITIN had a history of working with . . . KRAVETZ while she was employed at ARNOLD . . . and that each of those projects was both real and completed"). But

---

**11.** The government amplified these points at Kravetz's sentencing, bluntly declaring:

> [L]et there be no mistake about it, it was Carolyn Kravetz, *not her codefendant Boris Levitin,* that controlled this scheme from start to finish. She controlled the purse strings. She decided what purported projects Mr. Levitin would invoice. She even decreed how much he should be charging for those projects.

Kravetz Sent. Tr. 8 (emphasis supplied).

all these excuses were palpably thin, making reliance on them—and paying the kickbacks—facially indefensible.

That said, Dunkin' admitted in a civil settlement agreement with Levitin that he performed actual work on six of the 15 projects for which he was engaged, Ex. 5 at 1–2, completing at least one by the government's own account. *E.g.*, Indictment ¶ 10. Corroborating these concessions are binders of substantial work product that the defense would have introduced at trial, along with stacks of contemporaneous email correspondence between Levitin and Dunkin' representatives regarding pending assignments. The following chart illustrates the point:

| PROJECT | NO. Of EMAILS BACK AND FORTH |
|---|---|
| Rebranding | 7 (8/04, 11/04) |
| Video Editing | 1 (12/04) |
| Franchisee Recruitment (Labels) | 8 (12/04, 8/05) |
| Crisis Management (Poster, Envelope) | 113 (2005–06) |
| Extranet (Initial Research) | 26 (5/05–1/06) |
| Corp. Ownership Changes | 5 (7–8/05) |
| Health Benefits of Coffee | 6 (9–10/05) |

Among this email cache—available for review upon request—were many unsuccessful pleas by Levitin to Kravetz for directions and specifications needed to commence or complete outstanding work, further establishing Levitin's initial good faith. *E.g.*, 8/4/06 Proffer at 2 ("LEVITIN claims that he did not receive the specifications required to complete the project."); *id.* at 4 ("KRAVETZ did not give him the required specs"); *id.* ("On many occasions, LEVITIN attempted to get KRAVETZ to give him more information so that he could complete the projects, but he was unsuccessful.").

By the summer of 2005, however, Kravetz's "procrastination" and stonewalling had begun to arouse Levitin's suspicion and "concern[.]" 8/4/06 Proffer at 4; 7/14/08 Proffer at 1. Afraid he "could not complete" the growing pile of unfinished "projects," Levitin demanded that Kravetz "advance them" and threatened to "return any future DUNKIN payments." 8/4/06 Proffer at 5; 7/14/08 Proffer at 1. At that point Levitin made another grave and indefensible error. Instead of following through on his pledge to "resign and issue a refund," *id.* at 2, he ignored the red flags and plowed ahead with Kravetz. More precisely, he accepted Kravetz's lame apologies and excuses for "why the projects had been delayed," 8/4/06 Proffer at 5, crediting her "detailed" plan to eliminate the backlog. 7/14/08 Proffer at 2.

Despite the absence of a formal agreement, Levitin thereby joined Kravetz's scheme—if he had not already done so or having merely been complicit in it—when he should have known better. Over the next few months, the undone work snowballed and the situation spun out of control. Most confounding, Levitin took on a clutch of new assignments, intensified his billings and paid the bulk of the kickbacks. *E.g.*, Govt. Sent. Br. re Kravetz 3." PSR ¶¶ 7–8. And while Levitin professed to worry about hurting Kravetz, damaging her career or subjecting her to civil suit, 8/4/06 Proffer at 4; 7/14/08 Proffer at 2, that does not diminish his egregious "[mis-]judg[ ]ment," *id.*, in escalating the fraud when he had a prime opportunity to expose and end it.

On the other hand, Levitin did reimburse all $396,875 he received from Dun-

kin'—including Kravetz's one-half share of almost $200,000—concretely demonstrating his remorse and making him a highly unusual fraud offender. *E.g.*, PSR ¶ 9; Kravetz Sent. Tr. 13 (prosecutor: "Levitin paid the entire $396,875 to Dunkin' ..., even the amounts that he had kicked back to ... Kravetz. He paid the whole freight on that so there is no restitution to be had."). What is more, Levitin paid Kravetz by check, recorded his Dunkin' earnings on his corporate books and reported them on his 2004 corporate tax return, 8/4/06 Proffer at 6—additional proof of his initial good faith, lack of fraudulent intent and innocent state of mind.

Given these facts, Kravetz's probationary sentence and her concededly greater culpability, considerations of fairness, uniformity and proportionality also merit a noncustodial sentence for Levitin. *See* 18 U.S.C. § 3553(a)(6) (stressing "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). Indeed, the government all but confessed as much at Kravetz's sentencing:

> Mr. Levitin will come in here in September for his sentencing. Now, if Ms. Kravetz received a sentence of probation that she requests, Mr. Levitin will say, well, Your Honor, I'm the less culpable party here, I should also receive a sentence of probation.
>
> Now, at that point Mr. Levitin, *he'll have a point with regard to his culpability on the sliding scale of culpability. He is less culpable for this crime than*

*Ms. Kravetz was*. After all, she was the one who was the orchestrator of the offense. She controlled the scheme and the purse strings. And to some degree she controlled Mr. Levitin's actions. And, finally, she was the one who had been entrusted with Dunkin' Brands money. And that was the trust that she took advantage of shamelessly and repeatedly.

Kravetz Sent. Tr. 10 (emphasis supplied). These confessions are especially pregnant in view of Levitin's tenuous medical condition, to which we now turn.

### *LEVITIN'S PRECARIOUS HEALTH*

Many defendants come to court for sentencing with tales of medical woe. Not many come with a stack of doctors' letters calling them so "very sick" [12] that "even short-term incarceration will be potentially disastrous" [13] and "extremely detrimental," [14] possibly causing their "demise." [15] Boris Levitin is one of those unlucky few. *Cf., e.g., U.S. v. Willis*, 322 F.Supp.2d 76, 85 (D.Mass.2004) (Gertner, J.) (departing downward to probationary sentence, with home detention and electronic monitoring, because "not many defendants" as sick as "Mr. Willis").

"Despite his relatively young age" [16] of 45, Levin suffers from "multiple serious medical problems" [17] as enumerated in our INTRODUCTION. Leading the way, according to a cadre of physicians, are progressive Type II diabetes, [redacted] [18]

---

**12.** 3/26/10 Ltr. of Michael Maysky, MD (Ex. 6).

**13.** *Ibid.*

**14.** 4/2/10 Ltr. of Irina Maysky, MD (Ex. 7), at 2.

**15.** 6/23/10 Ltr. of Maureen M. Okam, MD (Ex. 8), at 2.

**16.** Ex. 6.

**17.** Ex. 7 at 1.

**18.** PSR 12–14; Exs. 6–8; 3/17/10 Ltr. of Chinweike Ukomadu, MD (Ex. 9); 5/7/10 Ltr. of Irina Maysky, MD (Ex. 10).

These infirmities require an array of daily medications—[redacted] [19],[20]

Significantly, Levitin's physicians agree that his condition will radically deteriorate—if he survives at all—should his current treatment plan be disrupted by a prison sentence. As Dr. Irina Maysky, Levitin's primary care provider, writes [redacted]

[redacted]

Ex. 7 at 2 (emphasis supplied).

Levitin's [redacted] Tufts Medical School professor Michael Maysky, echoes these warnings, [redacted]

[redacted]

Ex. 6 (emphasis supplied).

Yet a third physician, [redacted] Chinweike Ukomadu, joins these vital recommendations and otherwise dire predictions, [redacted] Ex. 9 (emphasis supplied).

Combined with his checkered upbringing, the unusual circumstances of his offense—for which Levitin accepts full responsibility—and his diminished culpability relative to Kravetz, Levitin's grim medical situation thus warrants a noncustodial disposition here. Conversely, and without exaggeration, prison could literally spell a "death sentence" for this particular defendant in this particular case. *Willis*, 322 F.Supp.2d at 85.

As a fourth doctor, [redacted] Maureen Okam of Harvard Medical School, ominously concludes:

[redacted]

Ex. 8 (emphasis supplied).

*Levitin Battles Degenerative Liver Disease and Its Formidable Side Effects*

Highlighting Levitin's litany of afflictions are [redacted] [21],[22],[23] Levitin's internist explains [redacted]

[redacted]

Ex. 7 (emphasis supplied).

Based on Levitin's [redacted] lone, the "specialist" mentioned—an Associate Professor of Medicine at Harvard—estimates his life expectancy as no more than 12 years, and quite possibly fewer. *See* Ex. 9 [redacted] PSR ¶ 55 (similar).

As threatening as the disease itself are its deadly side effects. Chief among these are [redacted] [24],[25]

In sum, according to Levitin's Harvard [redacted] Ex. 8 at 3.

*Levitin Struggles with Corrosive Diabetes and Heart Disease*

[redacted]

[redacted]

*Id.* (emphasis supplied).

[redacted] [26],[27],[28],[29]

19. PSR ¶ 60; Ex. 8 at 1; Ex. 9 at 1.

20. PSR ¶ 53; Exs. 6–10.

21. *E.g.*, PSR ¶¶ 54–55.

22. Ex. 10; *accord* Ex. 8 at 1. (reporting that Levitin's liver functioning has "progressively gotten worse").

23. *E.g.*, PSR ¶¶ 54–55; Ex. 7 at 1.

24. *E.g.*, Ex. 8 at 1; Ex. 9.

25. *Ibid.*

26. *E.g.*, PSR ¶ 56; Ex. 7 at 1.

27. *See* Ex. 7 at 1; Ex. 10.

28. PSR ¶ 56; *accord* Ex. 7 at 1.

29. On top of his diabetes, liver and heart troubles, and accompanying issues, Levitin is morbidly obese (306 lbs.), has high blood pressure and severe sleep apnea requiring nightly use of a CPAP machine. *See, e.g.*, PSR ¶¶ 51, 53; Ex. 7 at 1–2; Ex. 8 at 1. Sleep apnea in particular—or "episodes of blocked airways during sleep"—can "cause or worsen Heart Failure, Pulmonary Hypertension, and Cardiovascular disease." Ex. 7 at 2.

*Prison Will Aggravate Levitin's Medical Condition, if Not Kill Him Altogether*

The "common sense" concerns of Levitin's physicians, *U.S. v. Baron*, 914 F.Supp. 660, 664 (D.Mass.1995)—that jail will interrupt his continuity of care and exacerbate his compromised health—are validated by courts and commentators alike. Indeed, the increased risk of stress and infection in the unsterile prison setting is so "well documented," *U.S. v. Blarek*, 7 F.Supp.2d 192, 212 (E.D.N.Y.1998), as to be a "truism"—especially for a defendant prone to profuse and spontaneous bleeding. *Willis*, 322 F.Supp.2d at 84 ("No doctor would say" that an "infirm defendant would be better off in jail, or that jail is as adequate as private care.").

Given their close confines, "poor sanitation and ventilation," airborne germs abound in federal prisons, *U.S. v. Hammond*, 37 F.Supp.2d 204, 208 (E.D.N.Y. 1999) (citation omitted), which have become "serious incubators of [contagious] disease." Natalie Hinton, Comment, *Curing the BOP Plague with* Booker: *Addressing Inadequate Medical Treatment in the Bureau of Prisons*, 41 J. Marshall L.Rev. 219, 234 (2007) ("Hinton") (citation, footnote, internal quotes and alteration omitted). And because of rampant overcrowding, underfunding and understaffing, the "quality" and availability of BOP health care have "plummeted," *id.* at 232–33 n. 60 (citation and internal quotes omitted), meaning almost certain disruption of Levitin's "particular treatment plan." *U.S. v. Ribot*, 97 F.Supp.2d 74, 83 (D.Mass. 1999); *accord, e.g., Blarek*, 7 F.Supp.2d at 212 ("special [treatment] regimen," closely supervised by medical professionals, likely impossible "within a correctional facility").

For these reasons and others discussed in the next section, prison would surely hasten Levitin's decline—if not kill him outright—making a more medically "detri-mental" environment hard to imagine. Ex. 7 at 2; *accord, e.g., Willis*, 322 F.Supp.2d at 84–85 (sick defendant "will emerge in substantially worse shape than he is now, if he does not die before completing his sentence"); *Blarek*, 7 F.Supp.2d at 212 (incarceration likely "detrimental" to defendant's health, reducing his "life expectancy"); *U.S. v. Gigante*, 989 F.Supp. 436, 443 (E.D.N.Y.1998) (because prison "significantly harder [for sick defendant] to endure," life would be both "threatened and shortened" by incarceration) (citations and internal quotes omitted); *Baron*, 914 F.Supp. at 664 (overwhelming "likelihood" of exposure to germs and stress, triggering physical "deterioration").

*The BOP Cannot Adequately Handle Levitin's Delicate Medical Situation*

The government may counter with the "boilerplate" assertion, *U.S. v. Martin*, 363 F.3d 25, 50 (1st Cir.2004), that the BOP offers "a full range of . . . health services," *U.S. v. Derbes*, 369 F.3d 579, 582 (7th Cir.2004) (citation and internal quotes omitted), and can treat "medical conditions of all kinds." *U.S. v. Gee*, 226 F.3d 885, 902 (7th Cir.2000); *see Willis*, 322 F.Supp.2d at 84 ("I have never had a case before me in which the Bureau of Prisons suggested that it did *not* have the capacity to care for a defendant.") (emphasis supplied).

These "general assurances," however, "have not been given much weight." *Derbes*, 369 F.3d at 582 (collecting cases); *accord, e.g.*, Hinton, 41 J. Marshall L.Rev. at 239 (noting "recent rejection of generalized [BOP] letters" touting ability to "treat a wide variety of medical illnesses") (footnote and citations omitted); *Ribot*, 97 F.Supp.2d at 83 (doubting BOP claim of adequate programs to address defendant's health problems; "imprisonment necessarily means interrupting any treatment—a

period prior to classification (6–12 weeks, perhaps), then classification, and finally, treatment").

After all, the question is not whether needed medical care is theoretically available, but whether the defendant "realistically has any likelihood of receiving" it. *Derbes*, 369 F.3d at 582. The answer for Levitin is a resounding no.

*U.S. v. Pineyro*, 372 F.Supp.2d 133 (D.Mass.2005), illustrates the point. Pineyro, a gun-possessing felon, faced an advisory Guideline range of 46–57 months, *id.* at 134, well above Levitin's 21–27. Like Levitin, he suffered from chronic, "complex" medical conditions, demanding "an elaborate treatment plan" and scrupulous monitoring by a "plethora of specialists." *Id.* at 134–37.

Finding the BOP's cursory "assurances" of "adequate care" less than "persuasive," Judge Gertner "concluded that Pineyro's condition could not be [appropriately] addressed in a BOP facility." *Id.* at 135. The BOP's "vague promises" about how it could "accommodate Pineyro," the Court declared, "did not begin to compare with the existing, detailed treatment plan of Pineyro's doctors. . . ." *Id.* The Court went on to elaborate:

> While the BOP has represented that it will be able to address Pineyro's complex medical needs, the record reflects otherwise. In August 2003, the Court received what can only be described as the standard BOP letter, giving vague assurances that Pineyro would be classified and that the BOP has a trained staff. I was not content with those assurances. *See Martin*, 363 F.3d [at] 50 (court not convinced that the BOP can adequately provide for defendant's medical needs during an extended prison term); *Gee*, 226 F.3d [at] 902 (determination that downward departure for defendant's physical condition was not an

abuse of discretion, where district court made decision after considering medical records and the testimony of treating physicians and where letter in which the BOP indicated that it would adequately tend to defendant was merely a form letter trumpeting its ability to handle medical conditions of all kinds); *Derbes*, 369 F.3d [at] 582–83 (remanding for justification that departure is appropriate because defendant's imprisonment will prevent adequate treatment).

*Id.* at 137 (footnote omitted); *accord* Hinton, 41 J. Marshall L.Rev. at 247 & n. 133 ("The BOP's consistent claim that it can address all medical needs of inmates has not proven true.").

Against this backdrop, the *Pineyro* Court imposed a below Guidelines sentence of time served (15 months), three years' supervised release and six months' home detention with electronic monitoring—equivalent to a nine level downward departure. *Id.* at 135, 138, 140. In words fully applicable here, Judge Gertner explained the sentence as follows:

> The BOP has not remotely met its burden of showing that it can provide the defendant with "needed ... medical care, or other correctional treatment *in the most effective manner.*" 18 U.S.C. § 3553(a)(2)(D) (italics supplied). It offered no treatment plan whatsoever and *surely nothing comparable to what Pineyro is presently receiving.* Its conclusion that it can provide the "necessary and appropriate treatment" is not only vague, it does not meet the statutory requirements (that Pineyro receive "the most effective" treatment).

\*  \*  \*

A sentence within the Guidelines range—indeed any sentence of imprisonment beyond what Pineyro has already received—would *substantially disrupt*

*an existing, elaborate and required medical treatment plan* ..., wholly without justification.... Only a non-jail disposition would be consistent with the rationale of the various departure provisions in the Guidelines and the underlying statute. *See Ribot*, 97 F.Supp.2d [at] 84 (downward departure of seven levels justified to preserve treatment plan).

372 F.Supp.2d at 138–40 (additional emphasis supplied); *accord, e.g., U.S. v. McFarlin*, 535 F.3d 808 (8th Cir.2008) (narcotics defendant; diabetes, high blood pressure, severe cardiac disease, sleep apnea; 11 prescription drugs; below-Guidelines sentence of probation and home detention); *Gigante*, 989 F.Supp. at 436 (lifelong racketeer and mob boss; stable heart condition; 183–month downward departure).

Even more compelling is *U.S. v. Rausch*, 570 F.Supp.2d 1295 (D.Colo.2008), a case closely tracking this one. Rausch possessed child pornography—a graver offense than Levitin's moderate scale corporate fraud with the victim made whole—and faced a stiffer 97–121 month sentence under the advisory Guidelines. *Id.* at 1296–97. His batch of "physical disabilities"—including uncontrolled high blood pressure, organ failure, heart disease and diabetes—strongly resembled Levitin's. *Id.* at 1300. Also like Levitin, Rausch took "multiple medications" and was awaiting a possible transplant in three to five years time. *Id.*

The Court began its § 3553 analysis by noting that it was "not predictable" whether Rausch would remain transplant eligible if committed to BOP custody—a potentially "fatal" consequence. *Id.* at 1303, 1306.

This was so, the Court continued, because transplant eligibility in prison is "subject to nonmedical considerations" such as available bed space, financial constraints and correctional imperatives. *Id.* at 1306. And, in turn, "suspension of eligibility pending Bureau of Prison processes and [additional] evaluation[s] could result in a lost opportunity for a transplant and interruption of [Rausch's] prescribed pain medications." *Id.*

With these concerns in mind, the Court remarked that

[e]ven when the U.S. Sentencing Guidelines were considered mandatory, downward departure was authorized under USSG Section 5H1.4 for "extraordinary physical impairment":

- *Willis*, 322 F.Supp.2d 76 (downward departure to 2 years probation warranted for defendant convicted of tax evasion because defendant was 69 years old and suffering from a combination of conditions including phlebitis, early stage chronic lymphocytic leukemia, colon polyps, hypercholesterolemia, and heart murmur. The opinion includes an excellent discussion of the principles behind the departure).[30]

- *United States v. Jimenez*, 212 F.Supp.2d 214, 216 (S.D.N.Y.2002) (defendant convicted of illegally reentering U.S. after deportation received downward departure for extraordinary physical impairment because after the offense she suffered a brain aneurism that resulted in severe memory loss, loss of strength in her right arm, headaches, blurred vision and hallucinations).

30. Apart from his heart and cholesterol issues, Willis—like Levitin—also took "several medications" and needed constant monitoring and testing for "multiple, serious, and deteriorating medical problems," including blocked arteries and high blood pressure. 322 F.Supp.2d at 76, 79–80.

- *Blarek,* 7 F.Supp.2d 192 (defendant convicted of conspiracy to commit racketeering and money laundering granted downward departure to three years of supervised release because of HIV-positive status).

- *United States v. Rioux,* 97 F.3d 648 (2d Cir.1996) (upholding downward departure based on physical condition and good works for a defendant convicted of violation of the travel act and scheme to commit extortion; defendant had received a kidney transplant 20 years prior, and the new kidney was diseased requiring regular blood tests and medicines, and the defendant also received a double hip replacement requiring monitoring).[31]

- *United States v. Long,* 977 F.2d 1264 (8th Cir.1992) (upholding probation for defendant convicted of money laundering whose extraordinary physical impairment left him vulnerable to victimization in prison).[32]

- *United States v. Baron,* 914 F.Supp. 660 (D.Mass.1995) (age and physical ailment of 76–year–old defendant, convicted of bank fraud, warranted downward departure to home detention and probation where defendant had cardiac condition and pituitary removed due to cancer, and was suspected of having prostate cancer).[33]

570 F.Supp.2d at 1304–05.

In light of these precedents and the § 3553 factors, the *Rausch* Court imposed a significantly below Guideline sentence of time served—one day in prison—with lifetime supervised release, home confinement and electronic monitoring. 570 F.Supp.2d at 1307. The Court justified the sentence as "the strongest penalty I can exact without putting Rausch's life at substantial risk," adding that his

> extremely poor health and the complexity of his needs for medical care override any value that further imprisonment would have.[And], given Rausch's frailty [among other considerations], his vulnerability to victimization in prison is an unnecessary and unacceptably high risk....

*Id.* at 1308 (footnote omitted); *accord, e.g., U.S. v. Carmona–Rodriguez,* No. 04 CR 667(RWS), 2005 WL 840464 (S.D.N.Y. April 11, 2005) (narcotics defendant statutorily ineligible for probation; diabetes and high blood pressure requiring "ongoing medical monitoring and treatment"; 30 month sentence, 16–27 months below advisory Guideline range); *U.S. v. Riccardi,* No. 98 CR 242(RWS), 1998 WL 635882 (S.D.N.Y. Sept. 15, 1998) (union embezzler; "myriad" health problems including heart disease and high blood pressure; proba-

---

**31.** Rioux's health problems, like Levitin's, required *monitoring,* "regular blood *tests* and prescription medications." 97 F.3d at 663. And while his renal functioning "remain[ed] stable," that did not deter the Second Circuit from affirming a 10 point downward departure. *Id.* at 662–63.

**32.** *Accord, e.g., Koon v. U.S.,* 518 U.S. 81, 111–13, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); *U.S. v. Gonzalez,* 945 F.2d 525, 527 (2d Cir.1991); *U.S. v. Lara,* 905 F.2d 599, 605 (2d Cir.1990); *Blarek,* 7 F.Supp.2d at 211–12 (all recognizing extreme vulnerability and susceptibility to prison abuse as permissible departure grounds).

**33.** Aside from his heart- and cancer-related issues, Baron's "variety of ... substantial medical problems"—like Levitin's—also included high blood pressure, and required careful followup and monitoring. 914 F.Supp. at 661, 663–64 (internal quotation marks omitted). Given these parallels, "uprooting" Levitin to a "federal prison facility" would likewise deprive him of "regular interaction with physicians who are intimately familiar with his situation." *Id.* at 664.

tion, home detention, electronic monitoring).

Again, the persuasive reasoning of *Rausch* and associated cases—like that of *Pineyro*—applies equally here and argues strongly for a non-custodial sentence, by either downward departure or § 3553 variance. *See, e.g., U.S. v. Ruff*, 535 F.3d 999, 1004 (9th Cir.2008) (recognizing that supervised release and probation are "oppressive" punishments that substantially restrict defendant's liberty).

## LEVITIN'S PERSONAL QUALITIES FAVOR A LENIENT SENTENCE

We have attached over 40 character letters in support of this submission, a number reflecting the significant and meaningful role that Mr. Levitin has played in the lives of friends, colleagues, clients and family. It would be impossible to include a letter from every individual Mr. Levitin has positively influenced, and equally daunting to comment on every letter received.[34] Still, the myriad letters on which we do remark paint a consistent picture of a respected and selfless friend, and a dedicated and tireless employee and small business owner. The letters also speak of a guileless and "softhearted person," (4/30/10 Ltr. of Martin Rommel (Ex. 11)), whose misplaced loyalty to a deceitful friend now brings him before this Court. Sadly, were it not for this sentencing, many of Mr. Levitin's exceptionally good deeds probably would have gone unrecognized.

*Levitin's Continued Presence Is Key to the Success of His Clients and Partners*

The highly specialized nature of Mr. Levitin's work places him in a unique position whereby even his temporary absence could prove disastrous to his clients. Indeed, Mr. Levitin is uniformly hailed as "irreplaceable," (4/7/10 Ltr. of Maxim Osipov (Ex. 12)), and "fundamental to the success of [his] project[s]." 4/11/10 Ltr., of Luiz Duarte (Ex. 13). As noted in the PSR, Mr. Levitin owns and operates a graphic design and audience research business named Audiresys, Inc. PSR at ¶ 74. Starting the company with no capital investment in 1991, and initially operating only part-time out of his apartment, Mr. Levitin's freelance business became his full-time employment when he was laid off after 17 years in the research department at WGBH, the public broadcasting affiliate in Boston. *Id.* at ¶¶ 75–77. Tellingly, Mr. Levitin's clients have continued to work with him with "full knowledge of the pending charges against him." Ex. 13; *see also* 6/28/10 Ltr. of Craig Reed (Ex. 14) ("I am aware of Boris' legal issues ... I trust him and his company to diligently provide services for my company").

Luiz Duarte, Mr. Levitin's primary contact for DIRECTV and a major Audiresys client, praises his abilities and work ethic:

He is the most trustworthy person I have ever had the privilege to know and that is why I have entrusted my reputation and the future of my professional career by bringing him to lead my most important projects in the past few years.... As Senior Marketing Manager for DIRECTV Latin America, I hired Audiresys and Boris in 2008 to lead our company's preparations to start producing and selling audience measurement for the region.... His knowledge of television and audience research and measurement on the one hand, and the information systems necessary for these purposes on the other, is practically unique ... in a decade and half of active work in the business I have never met a

---

**34.** Additional letters are collected as Exhibit 45.

single one who offered these abilities in combination.

Ex. 13 at 1.

Sandro Mesquita, who also oversees Mr. Levitin's collaboration with DIRECTV, acclaims:

> I can confidently affirm that Mr. Levitin's support over the past two years [ ] helped take our project to heights which were unimaginable. In my professional estimation, he is without a margin of a doubt one of the most competent, thorough, scientific and honest professionals I have ever had the honor to work with and, most importantly, learn from. His work ethic is exemplary. He handles extremely complex projects and time[ ]lines and fulfils them with a higher level of professional excellence.

4/12/10 Ltr. of Sandro Mesquita (Ex. 15).

Craig Reed, the president of TRAC Media Services, another major of client of Audiresys, offers a similar endorsement:

> I have known Boris since 1991 when he was employed in the Research Department at WGBH. At the time I worked at PBS, the Public Broadcasting Service.... PBS and WGBH had a joint subscription to a viewing database. Boris visited our shop to automate WGBH's access to and reporting on the data. At that time, I realized that he was a good computer programmer and report designer.... I was pleased to work with Boris again beginning in 2006 when TRAC acquired a company called PubTV—a company that contracted work to Audiresys.... [Boris] has always delivered a reliable and high-quality product. I am depending on that to continue in the future.

Ex. 14 at 1–2.

Perhaps due to Mr. Levitin's exemplary work ethic and the concomitant responsibility with which he is entrusted, Messrs.

Duarte and Reed both write of the harm that would befall their respective firms should he receive a custodial sentence. Mr. Duarte begins:

> I do not believe that Boris can be replaced at all, but certainly not now that we have just begun selling our service and have already secured orders worth over $1 million a year.... We are in the middle of a tremendous effort to deliver the reliable and usable data our customers are paying for, and Boris is fundamental to the success of this project.... If he is prevented from working on the project even for a short time, the commercialization of [it] will, without any doubt, collapse immediately. We could lose all credibility with our customers and would not be able to regain it later.

Ex. 13 at 1.

Similarly, of a "Prime Time Highlights" report Mr. Levitin produces for his firm, Mr. Reed writes: "TRAC would have great difficulty replacing this service. Boris' history with the data provides insights that could not be replaced.... At a minimum TRAC would sustain substantial additional costs ... in replacing this service from Audiresys." Ex. 14 at 1. Concerning another service that Mr. Levitin provides to TRAC—a comprehensive report for American Public Television—Mr. Reed writes: "It would be very difficult if not impossible for TRAC to offer this service to APT without Boris.... If Boris were unable to complete this project ... it would severely damage our relationship with APT." *Id.* at 1–2.

Beyond his consulting work through Audiresys, Mr. Levitin is a partner in Practica Publishing, a firm that specializes in translating and distributing "arguably the highest quality medical texts available in the Russian language." 6/1/10 Ltr. of Bernard Sucher (Ex. 16). Maxim Osipov, Practica's President and CEO, explains:

[Mr. Levitin's] responsibility is to acquire translation rights from, and manage relationships with, mainly American scientific publishers.... Boris is a most reliable and efficient member of [ ] Practica.... He has also played a very important role in the company's survival at a time of major economic crisis in Russia in 1998, he found new partners for Practica in Germany. Earlier, he negotiated several co[-]publishing arrangements that provided Practica with badly needed capital. The company is in business today thanks to him.

Currently, Boris' service to Practica is irreplaceable, as the company has no-one else capable of negotiating licenses and managing our relationships with licensors. It has become quite a complex job, requiring experience and personal relations built up over many years. Furthermore, Practica is in the middle of a substantial management transition.... Russia is still mired in the global economic crisis ... and our company is in a weakened state because of this as well. To lose Boris now could easily prove fatal for it. Approximately thirty people would then lose their jobs, many of them would lose their only sources of income.

Ex. 12.

Reiterating this sentiment, Practica's editor-in-chief, Elena Timofeeva, notes: Boris "has been the link between the Moscow office of Practica and our foreign partners. During the latest years he has performed this duty *without any compensation* due to financial difficulties that our company [has] faced." 3/25/10 Ltr. of Elena Timofeeva (Ex. 17) (emphasis supplied). Ms. Timofeeva continues:

Boris has been an immense help in our daily work. He often supplied us with old or rare journal articles that clarified obscure places in the original English texts and helped in proper translation ... he also gave us valuable advice concerning translation of non-medical terminology and of details of American life, and helped us with matters of book design.... Boris is a key figure in negotiating disagreements that occasionally arise between the founding shareholders of our company and threaten its very survival.

*Id.* Finally, Bernard Sucher, another Practica partner, describes the sacrifices that Mr. Levitin has made for the firm:

It could hardly be said that Boris works for Practica because of the money. I thought of my original 'investment' in Practica as a charitable contribution to a good cause.... Practica has rarely been in a position to compensate Boris appropriately, and *it is typical of Boris that he has consistently subordinated his own interests so that the firm can make its Russian payroll.* Even after he was laid off from his workplace ... Boris persisted in deferring compensation for his essential work. His personal sacrifice contributes dollar for dollar to the welfare of his colleagues.

Ex. 16 at 2 (emphasis supplied).

*Levitin's Professional Colleagues Applaud His Dedication*

Echoing the praise of Mr. Levitin's current clients and partners, past co-workers and clients also hail his unflagging professional commitment. To begin, former colleague and WGBH radio host Steve Schwartz writes: "Boris cares passionately not only about his work, but about the mission of public broadcasting, to which he remains devoted even now.... When he was still at WGBH, Boris seemed to all but live there, often still working in his office late at night." 3/30/10 Ltr. of Steve Schwartz (Ex. 18); *see also* 6/23/10 Ltr. of Robert Lyons (Ex. 19) ("I saw Boris con-

tinuously demonstrate high professionalism and dedication to ... public broadcasting. To Boris, ... the work was more than a job"). Similarly, David Olson indicates that "[a]fter [Levitin] discovered that he had been laid-off, he worked with IT to hand over management of his hand-built systems so that there would be no interruption in service to his department and to WGBH as a whole." Undated Ltr. of David Olson (Ex. 20). Likewise, Lindsay Ellison informs the Court that she "found Boris to be highly professional, a man with technical prowess yet very humble, one with distinguished style who believed deeply in the mission of public broadcasting." 3/26/10 Ltr. of Lindsay Ellison (Ex. 21). Finally, WGBH Deputy General Counsel Jeffrey Garmel notes:

> Throughout my many dealings with Boris I found him to be a forthright, honest, reliable and decent man.... He worked for Pat Harris, who was one of the most respected ratings analysts for public television programming in the country. Pat [ ] thought very highly of Boris and they worked well together until she passed away....

6/15/10 Ltr. of Jeffrey Garmel (Ex. 22).

Apart from his former WGBH colleagues, Mr. Levitin's prior clients also sing his praises. For example, Thomas Narcavage, the general manager of a distribution company that hired Mr. Levitin for IT support, lauds him as a "consummate professional," adding:

> When the support firm we used went out of business and left us high and dry; Boris stepped in and told us he would personally continue to maintain our computers. Whenever we had any problem, all we had to do was call him and he would be in our office the same day to fix it I have gladly recommended him to firms that needed either computer hard-

ware or network solutions or market data analysis.

3/31/10 Ltr. of Thomas Narcavage (Ex. 23). Antony Partensky, who contracted out Mr. Levitin's services to other firms, concurs in this glowing assessment, illustrating his sterling reputation for integrity:

> In 2004 I hired Boris' services as I was not able to keep up with the growing business demand. I found Boris a very reliable, thorough, and skilled professional—a pleasure to do business with. When I sent Boris to a client I never had to worry; they were always satisfied and had nothing but positive feedback. At the same time, I could always count on Boris to keep me informed and consult with me if there were any issues or even new business opportunities. Thanks to the trust we have developed over the years I never had to worry about Boris competing with me for my business.

6/2/10 Ltr. of Antony Partensky (Ex. 24). Finally, Bernard Sucher sums up his experience in hiring Mr. Levitin to "develop graphic collateral and information systems" for his fund management business:

> [Boris] wanted the thing to be *right*. So, without being asked and at his own expense (time, of course being money), he rewrote that particular system several times. Further, Boris provided extensive support to correct configuration problems caused by my own IT staff. In the end, my company got what it needed....

Ex. 16 at 2 (emphasis in original).

*Levitin's Subcontractors Count on Their Wages*

Though Mr. Levitin is Audiresys's only full-time employee, he pays two subcontractors to assist in creating and maintaining his clients' databases and software sys-

tems. If Mr. LeviLin goes to prison, the finances of these individuals would be greatly impacted. Konstantin Aizikov, who describes Mr. Levitin as a "loyal, faithful and supportive friend," writes:

> Currently Boris is providing me with employment as a database development specialist through his company Audiresys, Inc., to create, maintain and support a database and several associated systems for DIRECTV Latin America. When complete, this database will store multiple waves of customer-survey fieldwork.... I am otherwise employed at a low-paying job that I took so as to have the time to finish my dissertation research.... I am a recent father and the sole provider for a family of three. It is imperative for our financial well-being that I keep my employment with Boris's company....

4/21/10 Ltr. of Konstantin Aizikov (Ex. 25). Similarly, Elena Morzhina, Mr. Levitin's girlfriend and another Audiresys subcontractor, notes:

> Currently, I am working in a spin-off effort to segment DIRECTV'S advertising inventory by demographics and establish the business case for each segment.... The income from this work is essential to me because I am a full-time student. I therefore request that, in addition to his human qualities, this be kindly considered when a decision is made on his fate, because his inability to work will eliminate an important source of my earnings.

3/16/10 Ltr. of Elena Morzhina (Ex. 26).

### Levitin Is A Selfless and Loyal Friend

Levitin's supporters extol him as "the most decent, generous, kind, sincere, intelligent and honest person I've ever known," (3/23/10 Ltr. of Sergei Ioannisyan (Ex. 27)), "honest and caring," (3/23/10 Ltr. of Dr. Natasha Markuzon (Ex. 28)), "dedicated and loyal," (3/25/10 Ltr. of Maxim Lubarsky (Ex. 29)), "incredibly kind," (3/23/10 Ltr. of Elena Ioannisyan (Ex. 30)), "always ready to help," (undated Ltr. of Anatoly Levin (Ex. 31)), and a "great and devoted friend." 5/10/10 Ltr. of Julia Sedykh (Ex. 32). In short, "Boris is [the] kind of person whom you can always rely on," (3/17/10 Ltr. of Dimitry Borkin (Ex. 33)) and "a perfect example of how real friends are and should be." Ex. 27. The instances below validate this well-earned reputation.

To begin, Mr. Ioannisyan tells of the numerous times when Mr. Levitin came through for him:

> Boris has always helped me, my family and many people I know. About four years ago, I needed to bring my wife to the U.S. from overseas. I asked Boris for help. Without any trace of hesitation, he agreed to help me.

*   *   *

> [Another] time I needed a ride to Boston Logan Airport. At that time I was staying in Rhode Island. With his busy schedule, Boris came all the way from Boston to Rhode Island, just to pick me up and take me to Logan Airport. It was about one hour and a half away! He did not even ask me for any money for the gas to compensate his long trip....

*   *   *

[redacted]

*Id.* Likewise, Karina Keshishian writes:

> [Fifteen] years ago I arrived in the U.S. as a new immigrant who did not drive and whose English was very rudimentary. Through mutual friends I met Mr. Levitin who, over several months, stoically mentored me in American life, gave me rides when I needed them, helped me improve my English, translated my diplomas, taught me the art of resume-writing, and tried to help me to get *my*

first job. He literally spent hours and hours helping, completely selflessly, without ever expecting any quid pro quo. 3/11/10 Ltr. of Karina Keshishian (Ex. 34).

Lev Levitin, Mr. Levitin's father, reports: "One of our mutual friends is an elderly lady who suffers from sudden epilepsy-like fits. On several occasions, I witnessed Boris literally carrying her in his hands, in order to deliver her to her home, a process that can take half an hour to negotiate one flight of stairs." 3/16/10 Ltr. of Lev. B. Levitin (Ex. 35).

Given Mr. Levitin's vast knowledge of information technology, many of the letters describe instances where he fixed friends' computers. 5/29/10 Ltr. of Constance Bigony (Ex. 36) ("He has worked tirelessly ... with [my] computer issues; often late into the evening until they were resolved"). Dr. Natasha Markuzon reports that Boris was "the first person to call if any trouble with my computer arose. Boris was always willing to spend hours to help me with my frequently malfunctioning computer." Ex. 28. Similarly, Julia Levin notes: "Boris was always able to find time in his very busy schedule to give me a hand whenever I had problems with my computer or needed help with my English classes." 3/17/10 Ltr. of Julia Levin (Ex. 37); *see also* Ex. 18 ("I called him innumerable times for help with my computer systems and he always responded as if it were an emergency"); 5/30/10 Ltr. of Sandi Bonfiglio (Ex. 38) ("He often worked endlessly and far into the night updating my old computer"); 3/28/10 Ltr. of Alexei Tsiganov (Ex. 39) ("Boris built my website and helped me maintain it for many years").

Lev Levitin distills these examples:

Boris is a kind and generous person by nature. He likes to be helpful, and he is always ready to sacrifice his time [and] efforts and sometimes money to help others. Being an excellent information technology professional, he has helped many people with their computer problems. I would often witness him working late at night trying to fix somebody's system.

Ex. 35.

In addition to repairing the computers of his friends and colleagues, Mr. Levitin has donated his time and technical expertise for charitable purposes. Amy Gross explains:

Boris and I remained friends after we were both laid off from WGBH in January 2004, and, after completing a Master of Public Health, I moved out of state and began working at a small business that conducted psychiatric clinical research. The company was suffering from the poor economic climate, and when we were trying to streamline some of our processes in order to stay afloat, I mentioned to Boris that we needed an electronic patient scheduling system. He offered to create a program at no charge to the struggling company. The program proved reliable and easy to use. This is just one example of how Boris has gone out of his way to help a friend in need or just do whatever to he could to serve a good cause.

3/25/10 Ltr. of Amy Gross (Ex. 40). Were that not enough, Mr. Levitin also developed a computer program for the non-profit organization of Mrs. Gross's husband, Daniel:

I moved to Charleston, South Carolina, to work as the attorney for the Center for Heirs' Property Preservation, a non-profit organization that provides free legal services to indigent heirs property owners at risk for losing their family land. One of the major challenges I faced was keeping track of hundreds of heirs and calculating their intestate in-

terest. The development companies who were acquiring most of this land could afford sophisticated software that could accomplish this task. The organization I worked for could not. Boris offered to create such software and provide it to the organization at no cost. He worked quickly and diligently on this project until it was complete and then provided IT support, at no cost.

3/25/10 Ltr. of Daniel A. Gross, Esq. (Ex. 41).

With a smattering of friends in the Russian immigrant community, many of the letters also describe instances where Mr. Levitin was called on to assist in travel arrangements. Anatoly Levin reports, "[m]any times I turned to him when I needed a ride (sometimes quite late at night)." Ex. 31. Dmitry Borkin writes: "[s]ometimes he was the only one who could offer me a ride to the airport." Ex. 33. Anna Lubarsky informs the Court: "He is the first person outside my immediate family I would ask for help or advice. On numerous occasions, Boris has driven me and other members of my family to the airport, even when this was at odd hours of the day." 3/24/10 Ltr. of Anna Lubarsky (Ex. 42).

Mr. Levitin's selfless nature has also made him the go to person for relatives of friends. [redacted]

*Levitin Is Widely Perceived as Naive and Overly Trusting*

Characterizing Levitin as "just so trusting and naive," (Ex. 37), many of his friends and colleagues acknowledge a vast gap between his intellectual and social prowess, particularly his (in)ability to read people. "It is possible that some people may [ ] take advantage of his good nature," writes Anna Lubarsky (Ex. 42). "Boris is [an] extremely honest, sometimes even naive person. And some people can easily

take advantage of it," verifies her husband, Maxim. Ex. 29. Martin Rommel writes:

Professionally, Boris is a sharp thinker with an enviable memory, but with people he feels close to he tends to be very trusting. *He commits himself emotionally to a degree that limits his ability to reflect on the other person critically.* Therefore, I am unsurprised that his activities under scrutiny involve a woman to whom he felt close.

Ex. 11 (emphasis supplied). Anatoly Levin explains this trait in greater detail:

When I learned about the episode that led to this unpleasant and difficult situation, I immediately knew that there must have been some personal feelings that dictated to Boris some of his regrettable steps. Boris is sometimes so eager to help a friend that he loses the bigger perspective. And also being a very softhearted person, he sometimes overacts to unexpected threats or to any kind of aggressive behavior and loses the realistic view of the situation

Ex. 31.

Finally, Lev B. Levitin, who well knows his son's weaknesses, comments:

Boris sometimes is incredibly naive, and tends to see people as better than they are. Because of that, he has been vulnerable to abuse and been bitterly disappointed. I have told Boris many times that he should learn to tell good people from bad ones, and to discriminate between his friends and enemies. This inability may cause tragic consequences for him. . . . [Here] Boris found himself in a very difficult and shameful situation. His failure to recognize personal characteristics and intentions of other people resulted in wrong judgments and some irresponsible acts. After he realized that, he experienced a deep shock and

was overwhelmed with grief, remorse, shame and regret.

Ex. 35.

*Levitin Deeply Regrets His Actions*

Despite the unfortunate circumstances that brought Mr. Levitin before this Court, the appended letters evidence the sincere and profound regret that he now feels for his actions. Ex. 41 ("I believe that he deeply regrets how the situation unfolded"); Ex. 40 ("I know that he genuinely regrets all that has happened"); 3/11/10 Ltr. of Irina Cherenkova (Ex. 44) ("He realizes that he has made a terrible mistake"); Ex. 36 ("deep remorse for his errors in judgment"); Ex. 33 ("Boris is suffering tremendous regret and remorse about everything that occurred")," Ex. 26 ("filled with regret by the bad choices he stupidly made"); Ex. 18 ("utterly tortured"). As Karina Keshishian rightly concludes: "Based on my long history with Mr. Levitin, I view him as someone who has made an error in judgment, but who is still a good human being at heart and who feels genuine remorse over these mistakes." Ex. 34.

Again, Lev Levitin synthesizes much of what has been written about his son:

> Boris was shocked and devastated by the betrayal of a person whom he believed to be a close friend for 20 years. I saw him at that time deeply depressed. Full of remorse and desperation, he tried to correct the situation as much as he could. It took him enormous efforts to collect [the] money, largely borrowing from friends, to return the total amount that was paid to him by Dunkin' Brands....

Ex. 35.

### CONCLUSION

Boris Levitin is a good man whose difficult upbringing, pliant nature, trusting in-

clinations and misplaced loyalty embroiled him in a highly unusual fraud scheme—one in which he was shamelessly manipulated yet immensely regrets, and for which he has fully reimbursed his corporate victim. He is also a very sick man, for whom prison would be a potentially fatal catastrophe. Levitin has already paid a heavy price for his mistakes, both financially and by his tattered personal and professional reputations. Any further punishment would be disproportionate to that of his more culpable codefendant and, to quote 18 U.S.C. § 3553, "greater than necessary" to achieve the purposes of sentencing. A non-custodial disposition is therefore "sufficient," *id.*, and appropriate in this case.

Dated: New York, NY

Aug. 17, 2010

Respectfully submitted,

**LAW OFFICES OF JEFFREY LICHTMAN**

By: _____

JEFFREY LICHTMAN (JL6328)

750 Lexington Ave. Fl. 15

New York, N.Y. 10022

(212) 581–1001

*jhl@jeffreylichtman.com*

**LAW OFFICE OF MARC FERNICH**

By: _____

MARC FERNICH (MF9819)

152 W. 57th St. Fl. 24

New York, N.Y. 10019

(212) 446–2346

*maf@fernichlaw.com*

*Counsel for Boris Levitin*

On the Memorandum:

Jeff Lichtman

Marc Fernich

Jeff Einhorn

## EXHIBIT 1

Anne Melnikova

[redacted]

Brookline, MA 02446

The Hon. Joseph L. Tauro

Senior U.S. District Judge

District of Massachusetts

One Courthouse Way

Boston, MA 02210

May 25, 2010

Your Honor,

My name is Anna Melnikova. I came to the U.S. in 1986, have worked since in social services for children and the elderly (I am now a senior case manager), have raised a daughter and become a grandmother. When I came to this country, I received substantial support from Dr. Lev B. Levitin, who helped me find my way in this country, as he has helped many others. It therefore especially pained me to see that his son, Boris Levitin, who gave me the impression of a very pleasant, well-intentioned, knowledgeable young gentleman, started spending time with my downstairs neighbor, Carolyn Kravetz, who even now features in my nightmares.

Because Boris is to appear for sentencing before you with Ms. Kravetz as his codefendant, please let me explain. I met Ms, Kravetz at one of the happiest moments of my life: when I moved into my new apartment. I was coming out of my new bathroom when suddenly there was a loud scream behind my front door. When I opened it, there was an angry young woman who was bouncing up and down like a ball and periodically shoving my shoulder.

Eventually I gathered that I had apparently caused a flood. Accompanying her to her apartment, I beheld three drops of water on the wall. The scene was then invaded by five men; Brookline police officers and condominium association members, whom Ms. Kravetz had called. After they left, I experienced a mild cardiac event.

Ever since, she consistently behaved as if she had the right to control my life, including everything from the shoes I wore to the carpeting I used. She called the police at 7pm when I had guests with a small child. She banged on my door if she thought that I had the television set on too loud (I never did). This sort of conduct was consistent for many years.

Ms. Kravetz sued me in the name of the condominium association, then threatened that she would go forward with the suit if I did not replace (not merely repair) my entire bathroom at a cost of approx. $20,000, which I did; those were my entire savings. Her housemate demanded, and I gave her, a key to my apartment to address emergencies during the construction. My apartment was thereafter visited in my absence after the construction had ended, and around $800 in cash stolen.

[redacted]

However, it was clear that Ms. Kravetz was an extremely manipulative individual. She could appear nice when it was in her interests, [redacted]

There was one unfortunate result from these regular, free dramatic performances. One of the people that Ms. Kravetz captured in her grasp appeared to be Boris, and when I finally got to talk to him this proved indeed to be so. He appeared to be full of love and concern, cared for her, brought her food and gifts, always with a happy smile on his face. [redacted] I wanted to ask him why he was associating with someone like her; I even thought of calling his father and posing the question to him, but I dared not do either so as not to butt into Boris's life. Having seen what Ms.

Kravetz involved Boris in, I deeply regret not having warned him.

I strongly believe that Boris was manipulated and deceived by this monster. I respectfully beg the court, as much as possible, not to cause him any further harm.

Respectfully,

Anna Melnikova

## EXHIBIT 2

## KAREN E. SWEENEY

[redacted]

## Lawrence, MA 01841

[redacted]

April 28, 2010

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

Your Honor:

My name is Karen Sweeney. Boris Levitin and I have been friends for 18 years. I'm writing this letter in the hope that you will see what a wonderful person Boris is. It is because he is a good and decent man that I was prepared to overcome my fear of Carolyn Kravetz and the humiliation of testifying in open court should it have been necessary. Unfortunately, he did not see that Carolyn was a very wicked person until it was too late.

I have known Boris since 1992, when Carolyn, my friend and lover at the time, introduced me to him. Since then, I have come to know Boris extremely well and know him to be a kind, generous, hard-working, and honest man. Boris is very intelligent and well-educated; qualities that Carolyn noticed in Boris when they first met and, later, used to her advantage whenever she needed him.

[redacted]

[redacted]

[redacted]

[redacted]

Afterwards, I discovered from speaking with former neighbors of mine that Carolyn stole things out of other people's homes. I found out that she also stole valuables from several of her friends and lovers, and used some of them, without their knowledge, to commit crimes. In addition, I learned that Carolyn ordered expensive items by mail and then falsely reported to UPS and American Express that the items had not been delivered. Carolyn, apparently, used a house key given to her by the neighbor to take care of the apartment in emergencies to steal credit cards belonging to the neighbor's daughter and, later, used them to buy expensive clothes and shoes that were delivered to the neighbor's door from where Carolyn then stole them. When the Brookline Police searched her apartment they found many of the stolen items.

Carolyn presented a completely different face to Boris. I think she knew that Boris was a principled man and that she would lose his friendship if he ever found out about the things she did to me and others. For this reason, Carolyn went to great lengths to behave and act differently of Boris. She told me and her friends who knew Boris never to talk her in front of him. When Boris visited the apartment she had to be part of every conversation. [redacted]

I don't know whether Carolyn had any positive feelings for Boris because she often badmouthed him to me behind his back, and because I long ago stopped trusting anything she said. But she al-

ways had the greatest respect for his intellect and his workmanship. Whenever she needed any help in her work or in her life that required these abilities, she turned to him.

Carolyn may have been mad; everyone I know who knew her, including her own sister, thinks so. But she also knew that she could not reveal her true face to Boris, who is one of the most straightforward people I know. Boris tends to see the good in people and Carolyn fully took advantage of this. Because they were never lovers, he never truly saw the psychotic side of her nature. She was a master manipulator; he was guileless and naïve. It's an awful combination.

I believe that Boris was victimized by Carolyn—she used the same tactics and strategy with me and others when she wanted something. Carolyn lied to him because she lied to everybody to get what she wanted. She was and is self-centered and conniving, concerned only for herself and her own selfish interests. I only regret not exposing Carolyn's lies to Boris. For instance, in 1998 when Boris told me that he gave her substantial financial assistance because of her low earnings, I knew her salary to be quite high; in fact, she purchased new cars for cash. [redacted]

[redacted]

sincerely,

Karen E. Sweeney

## EXHIBIT 3

[redacted]

Brookline, Massachusetts 02446

22 April, 2010

Judge Tauro

1 Courthouse Way

Boston, Massachusetts 02210

Your Honor,

I am writing this letter on behalf of Boris Levitin.

I wish to describe my experiences with Carolyn Kravetz, someone who deeply affected my life; seven years ago and even now in the present.

Some things, no matter how far in the past they happened, always stay with you.

When I first met Carolyn Kravetz, she was one, of the warm and welcoming neighbors in the condo building at [redacted] Brookline, MA [redacted] Carolyn made all efforts to be helpful; offering to feel my cat and take in my mail if I was out of town. She gained my trust and I like her and her partner.

She introduced me to her friends and included me in small get-togethers that she would host. [redacted] I even met Boris Levitin a couple of times. I would usually see Boris taking Carolyn grocery shopping in his car, even though Carolyn had a car of her own. Boris seemed like a 'best friend', lugging bags of things up the two flights of stairs. But after the chores were done, he would leave. What a great person to have, I thought.

Anna, who lived upstairs and knew Boris, would shake her head and say that he was being used. Others in the building would make similar comments going so far as to speculate that he might be in love with Carolyn. [redated]

I never paid much heed to what the neighbors said, until one time, at Carolyn's, Boris' name came up and what he did for her. Carolyn laughed, saying that she felt sorry for him and that he had no idea who she was and that he was willing to do anything for her. It was soon after, that I was about to find out who Carolyn Kravetz was when she entered my apartment without my permission and stole credit cards belonging to my daughter and myself.

I did not return home to find my apartment door forced open. Carolyn had a copy of my key. But the day that I realized my credit card was missing and that someone had used it, was a day of great fear, anxiety disturbing total confusion. How did someone know that I was away that weekend and I would not be there to receive the items charged on my card and sent to me? Was someone stalking me? Was this identity fraud? A day that was to be spent working turned into a fearful, paranoid episode.

But Carolyn was there to help. So devious was she that she had planned for this scenario. Call the police, she said. She would talk to them about what she had observed over the weekend. I was present while she gave false information to Officer McHugh about a package she had put at my door and 'a suspicious person' she had seen. I had to change my locks. She just happened to have a locksmith coming over. Don't worry, she would send him up to my apartment. Did I need anything at the store? I paid to have my locks changed by the locksmith who she called, but by the next day, when I realized that there were just too many coincidences, I paid another locksmith to change them again.

I spent time and effort to straighten out the financial mess caused by the use of my credit card and dealing with the Police who were very helpful. For months afterwards, I still had thoughts that I would have to face another incident of fraud resulting from Carolyn's repeated entrances into my home.

Carolyn had also made fraudulent charges on my daughter's credit card. Charging items and having them shipped to my daughter when we were both out of town.

What Carolyn did to me was wrong, but what she did to my daughter [redacted] Even now, as I write, I find my hand trembling with fear and anger over what Carolyn Kravetz did to us.

She had also convinced some residents of the building that I was. persecuting her. I received emails and letters from the condo board accusing me of this and of spreading false information about Carolyn. This was after she had been arrested for the burglary and the details were printed in the Tab Newspaper. This was part of her retaliation against me and my daughter for cooperating with the Police which resulted in her arrest. Carolyn was forced to accept responsibility for her crimes and was convicted. I was scheduled to testify at the trial, but at the last minute a deal was struck and she was only sentenced to PPI (pretrial intervention). When I was finally able to speak to the District Attorney, he was reluctant to admit that after 18 months Carolyn's record would be expunged. I made it quite clear to him that I was outraged because I knew that she would be back to her criminal behavior in 18 months and a day.

I had always considered myself 'street smart'. I grew up in a city, completed college, lived on my own and worked. I was never a suspicious person, but 'knew' if something was not right. I grew up in a family of Federal Law Enforcement agents (my father and brother) and was always made aware that not everyone is to be trusted. But what I encountered when I met Carolyn Kravetz still makes me shake my head and go over and over in my mind every word and contact that I had with her. Why didn't I see through her? Did I miss cues that she sent out? How stupid could I be?

My brother assured me that I did nothing wrong. There are people, criminals, out in the world who are that cunning, devious

and amoral. Carolyn is criminal and maybe mentally ill. I have also witnessed her temper directed to me and others. After her arrest, I was still living in the building and would have to pass her in the hall or outside. She would growl like an animal when we passed. I was just at the wrong place at the wrong time.

I believe this is what happened to Boris Levitin. Perhaps he could have made different decisions in dealing with Carolyn, but knowing how she lured me in, deluded me and appeared to be nice and reassuring and in charge, I believe most people would never have caught on to her sociopathic behavior.

I ask that the Court sentence Carolyn Kravetz and not Mr. Levitin and those of us who fell prey to her. We have suffered enough, made retribution and because, unlike her, we have a conscience, and will remember and question all that has happened to us for the rest of our lives.

Sincerely,

Josephine Shields

### EXHIBIT 5

### GENERAL RELEASE AND SETTLEMENT AGREEMENT

FOR GOOD AND VALUABLE CONSIDERATION set forth below, the receipt and sufficiency of which is hereby acknowledged, Dunkin Brands, Inc. ("Dunkin' Brands") hereby expressly, voluntarily and immediately releases, acquits and forever discharges Luminophore, Inc. and its principal Boris Levitin (together, "Luminophore") and all of Luminophore's respective directors, officers, shareholders, representatives, agents, attorneys, employees, predecessors, affiliated entities, successors and assigns, of and from any and all, rights, claims, causes of action, suits, debts, charges, complaints, liabilities, contracts, obligations, damages, expenses, including costs and attorneys' fees, of any nature whatsoever, in equity, by statute, contract, or otherwise, or any other liability known or unknown, which Dunkin" Brands ever had, now has, or may in the future have against Luminophore, for or by reason of any means or any event, matter or thing which arises out of or relates to payments made by Dunkin' Brands to Luminophore in the years 2004 and 2005. Dunkin' Brands farther warrants and represents that it has never assigned any claim or any part of any claim, either in law or in equity, which it now has or ever had against Luminophore which was or could have been asserted as of this date.

In addition, Dunkin' Brands and Luminophore (collectively, the "Parties") agree that:

Dunkin' Brands hereby accepts from Luminophore the sum of $396,875, equal to all payments by Dunkin' Brands to Luminophore in the years 2004 and 2005.

1. Upon receiving such payment, Dunkin' Brands shall be deemed paid in full and shall not seek, claim, or accept further payment for the above items from Luminophore, its principal, Boris Levitin, or any other party expressly included in this release.

2. The refund of the totality of payments by Dunkin' Brands to Luminophore notwithstanding, Dunkin' Brands acknowledges the performance by Luminophore of the following items of work, contracted in the above period (all accepted, except item (f) as shown):

a. Crisis management—in-store crisis materials (poster including Spanish version; nine redesigns of English version; design and subse-

quent redesigns of distribution envelope);

b. External communications: graphics for video-uplink presentations on the rebranding of Dunkin' Brands (from Allied Dornecq QSR). between late August and early November 2004 (three separate graphics projects);

c. Website ownership information change (research into Pernod Ricard ownership information completed):

d. Franchisee recruitment labels (Phase 1: non-personalized labels completed and accepted December 26, 2004);

e. Extranet website for regional PR agencies (platform selection component, summer-autumn 2005); and

f. Health benefits of coffee for PR use (Phase 1: a press coverage survey; accepted September 29, 2005; Phase 2: a scientific literature survey, completed but not accepted).

The Parties further agree that each shall be responsible for their own respective legal fees and costs, and waive any claim against any opposing party for payment of fees and costs.

The Parties acknowledge and agree that this Release and the settlement of the above-described matter shall in no way be construed or treated in any respect as an admission of liability, concession of any sort or a breach of duty on the part of any of the Parties hereto. It is understood that the settlement of the above-described matter is an amicable resolution of a generally disputed claim, and that the above-described payment is being made solely in order to avoid further uncertainty, controversy, notoriety and expense of litigation. The parties acknowledge that this release is not intended to directly or indirectly run to the benefit of Carolyn Kravetz or her heirs or assigns.

This Release constitutes the entire agreement between the Parties hereto, and the terms of this Release are contractual and not a mere recital. This ReJease may not be modified except by a writing jointly signed by the Parties. If any provisions or terms of this Release shall be held for any reason to be invalid or unenforceable, such invalidity and unenforceably shall not affect any of the other terms hereof, and this Release shall be construed as if such invalid or unenforceable term had never been contained herein.

This Release in all respects shall be interpreted, enforced and governed by and under the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws provisions thereof

The Parties executing this Release represent that they are authorized to do so and are acting of their own free will and with full knowledge of and agreement with the terms and provisions of this Release. The Parties acknowledge that they have been advised and given the opportunity to consult with their respective counsel prior to signing this Release.

This Release shall bind and inure to the benefit of the Parties and their respective heir, successors and assigns.

The signatures of each of the Parties to this Release may be executed on separate pages, which, when attached to the Release, shall constitute the Parties' complete agreement. The Parties may execute more than one counterpart of this Release and each executed counterpart shall be deemed an original,

[signatures on next page]

Signed under seal this 23day of June, 2008.

Dunkin' Builds, Inc.

By:

Its:

Signed under seal this 23day of June, 2008.

Luminpphore Inc.

By:

Its:

Boris Levitin

## EXHIBIT 11

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

1 Courthouse Way

Boston, MA 02210

April 30th, 2010

Your Honor:

I am a 44–year–old physicist working on cargo scanning systems for customs and antiterrorism applications. Originally, I am from Germany and live now with my wife and children in Lexington, Mass.

I have known Boris Levitin for 15 years and feel that I know him quite well. We meet frequently and I value him as a sincere, honest and reliable friend. He has always been a welcome guest in our house and everybody enjoys his company. Boris was one of the first people we invited to our wedding and for him it was no question that he would make the trip to Germany; he even read to the congregation as part of the wedding service. Often he goes out of his way to assist and support his friends, from help with computers to rides to the airport, the list is long. Despite my parents' very limited English he gave them a tour of Boston when we were unable. With all this in mind, I was most surprised when I learned about the legal difficulties Boris has found himself in. I could never imagine Boris becoming the subject of something more serious than a mere speeding ticket.

Professionally, Boris is a sharp thinker with an enviable memory, but with people he feels close to he tends to be very trusting. He commits himself emotionally to a degree that limits his ability to reflect on the other person critically. Therefore I am unsurprised that his activities under scrutiny involve a woman to whom he felt close.

Having observed Boris' behavior since charges were brought against him, I can attest to the fact that the ensuing experience has been a deeply felt trauma for him already. It has shaken his world and I am deeply convinced that time in prison will not make him a better person but more likely destroy him.

I am saddened that there is so little I can do to help him in this situation. Therefore I appreciate the opportunity to at least offer my opinion on this matter.

Respectfully,

Martin Rommel, Ph.D.

Lexington, Mass.

[redacted]

## EXHIBIT 12

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

7 April 2010

Your Honor,

I know Boris Levitin since early childhood: I am two years older than he is, and our parents were very close friends. In 1972 Boris emigrated from the USSR; his last evening in Moscow we spent together. Twenty years later I started coming to the

U.S. on a regular basis, and our relations became close again.

Soon afterwards we started working together. In 1994, with Boris's help, I founded a medical publishing company, Practica, dedicated to translating the leading Western books. Boris and I became partners. His responsibility is to acquire translation rights from, and manage the relationships with, mainly American scientific publishers, such as McGraw–Hill, Elsevier, Lippincott, and others.

Boris is a most reliable and efficient member of the Practica team: he negotiates favorable contracts with foreign publishers and checks up on our fulfillment of the obligations they impose. He has also played a very important role in the company's survival: at a time of major economic crisis in Russia in 1998, he found new partners for Practica in Germany. Earlier, he laboriously negotiated several co-publishing arrangements that provided Practica with badly needed capital. The company is in business today thanks to him.

Currently, Boris's service to Practica is irreplaceable, as the company has no-one else capable of negotiating licenses and managing our relationships with licensors. It has become quite a complex job, requiring experience and personal relations built up over many years. Furthermore, Practica is in the middle of a substantial management transition. Boris is invaluable as the one person who can achieve entente among competing interests of founders, shareholders and managers. As Your Honor is probably aware, Russia is still mired in the global economic crisis, much more so that the West, and our company is in a weakened state because of this as well. To lose Boris now could easily prove fatal for it. Approximately thirty people would then lose their jobs; many of them would lose their only sources of income.

I would like to say a few words about Boris's character. Since Russian physicians have far lower income than their American colleagues, Practica's activities have never really been profitable, and for all these years Boris's work was guided chiefly by ideals rather than economic reasons: like all of us at Practica, Boris believes that Russian physicians should use the best medical texts in the world, as this will serve their patients' health.

As for the case which Your Honor must adjudge, I wish to state the following: I would never believe that Boris would break the law intentionally. Boris is not greedy at all, and I am very much convinced that he must have either been manipulated by someone else or became the victim of tragic circumstances. I am also quite convinced that if Boris found himself in a situation in which he had caused damage, he would compensate it, and in fact he has done so in this case. I know Boris as long as he has been alive; he is a truthful, kind and just person, and I am happy to consider him one my best friends.

Maxim Osipov, M.D., Ph.D. (Medicine)

CEO and President, Practica Publishers, Ltd., Moscow

Chairman, Endowment in Support for Tarusa Hospital

Cardiologist, Tarusa Hospital

### EXHIBIT 13

New York, April 11, 2010.

Hon. Joseph Tauro

United States District Court

District of Massachusetts

One Courthouse Way Boston, Massachusetts 02210

Your Honor,

I am writing to you concerning Mr. Boris Levitin.

I have known Boris for eight years as a friend, employee and contractor. He is the most trustworthy person I have ever had the privilege to know and that is why I have entrusted my reputation and the future of my professional career by bringing him on to lead my most important projects in the past few years, in full knowledge of the pending charges against him.

I met Boris in 2002 when I was appointed Director of Research at WGBH, the major public broadcaster and production house in Boston. Boris was responsible for the information systems used by the department, many of his own creation, and for some of the analysis. I had big plans for our unit and Boris was there to back them up at every turn, producing amazing work on very tight deadlines. I was so impressed with his work that I hired him through his company at every position in the field I had since then: at Sony, TiVo and now at DIRECTV.

As Senior Marketing Manager for DIRECTV Latin America, I hired Audiresys and Boris in 2008 to lead our company's preparations to start producing and selling audience measurement for the region, VDC. His knowledge of television and audience research and measurement on the one hand, and the information systems necessary for these purposes on the other, is practically unique: there are people who understand broadcasting and measurement, and there are good systems developers, but in a decade and a half of active work in the business I have never met a single one who offered these abilities in combination.

For this reason, I do not believe that Boris can be replaced at all, but certainly not now that we have just begun selling our service and have already secured orders worth over $1 million a year from four customers representing some 70 television channels, with sales efforts in the service countries still to follow. We are in the middle of a tremendous effort to deliver the reliable and usable data our customers are paying for, and Boris is fundamental to the success of this project. It is reasonable to estimate that there are only a handful of experts in this country capable of handling the responsibilities assigned to Boris. If he is prevented from working on the project even for a short time, the commercialization of VDC will, without any doubt, collapse immediately. We would lose all credibility with our customers and would not be able to regain it later.

Boris is my essential expert in ensuring the design, development and deployment of many other high-technology projects. Here are just a few examples:

- Every month, he produces several hundred analytical reports using a proprietary technology he developed and which is not commonly available in the market. It cannot be replicated. These reports are used by top management and clients for decision-making in businesses involving millions of dollars. In response to internal customer demand, we are planning new reports and a weekly publication cycle. Our new commercial customers are already asking for new types of reports as well. Boris's reports are automated, but because our systems are in flux and requirements change with almost every reporting period, so do the reports, and running them still requires substantial effort. Boris is also starting to produce such reports for our colleagues at DIRECTV U.S.

- Boris has been conducting an audit of the entire VDC system, end-to-

end, for the past year and a half and is expected to keep doing so for another two years or so. An audience measurement system, especially one so incredibly complex, raises unique engineering, operational and documentation challenges. There is not a single person who understands even a large portion of it in detail—other than Boris, and he only does because he has been investigating, questioning and testing it element by element. After so many hours of dedication to this work, he is the only one capable of properly documenting and proposing action on issues found. Any disruption of his work will set us back an unpredictable amount of time in the development of our business. Problems not discovered by Boris would be discovered by our customers, with predictable results.

• Boris is in charge of ensuring that our new delivery systems provider in Denmark has the correct data and knows what to do with it. This involves developing numerous algorithms, building automated systems and managing rapidly changing datasets. For example, Boris has developed and is implementing a new method for VDC to keep track of sample-member set-top boxes (a perennial problem with severe consequences); he has written a new algorithm to decide which set-top boxes are credited to a given day's intab, instead of the inadequate one currently in use; and he is in charge of managing data about the channels our satellites carry, of which there are almost a thousand. This last responsibility—channel management—was only recently proposed as an ongoing *full-time* po-

sition. Boris can do it in just a few hours a week. Aside from being irreplaceable on many critical projects, he also saves us a great deal of money on others.

• Boris's firm, Audiresys, is working with an analyst on advertising sales support and has already provided us with the business case to sell our exclusive rights to the 2010 World Cup. Currently, they are pursuing a novel approach to demographic segmentation of our advertising inventory. In a separate effort, Audiresys is employing a developer to create and later enhance and maintain a database for our quarterly customer survey; this project also involves the development of middleware to a reporting system and of the reports themselves. These data include key company performance measurements. A halt to this process will lead to the loss of income by Audiresys' subcontractors and very significant project delays at DIRECTV.

• Audiresys maintains and produces content for several online databases consulted by scores of DIRECTV employees throughout Latin America on a daily basis. The sudden unavailability of these systems will cause significant disruptions to various operations in offices around Latin America.

Our only other technical staff on VDC consists of two database developers in Long Beach, Ca., for whom VDC is one of nine projects and who spend an even smaller fraction of their time on it. Not only are they not able to undertake Boris's work, but he is now having to do a substantial amount of work that was intended to be done by them. On the other projects for which Boris is responsible, we have no-one who could replace him.

While I can't speak for our entire company, I can assure you that my department, Research, relies very heavily on Boris and any disruption of the service he provides will cause severe and catastrophic effects on our operations, leading to loss of revenues and credibility in the marketplace, as well as a drastic decrease in the number and quality of services we can offer our internal clients.

It would be of great benefit to me and the company I work for should Boris remain free to continue producing critically needed work. I frankly don't know what I would do without him.

Should you have any questions, please do not hesitate to call me.

Cordially,

Luiz Guilherme, Ph. D.

[redacted]

Southport, CI 06890

[redacted]

## EXHIBIT 14

Tucson, AZ 85712

June 28, 2010

Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

One Courthouse Way

Boston, MA 02210

Your Honor,

I am writing to describe the services provided to my company by Boris Levitin and his company, Audiresys, Inc. My company, TRAC Media Services provides audience information and analyses to public television stations, distributors and, producers across the country. We have been in business since 1979 and we are the only independent provider of such information in the industry. Audiresys has provides us with invaluable analysis and software support. What follows is a point-by-point summary of my history with Boris and how he contributes to our efforts at TRAC:

- I have known Boris since 1991 when he was employed in the Research Department at WGBH. At the time I worked at PBS, the Public Broadcasting Service. WGBH was the largest producer of programming for public television and PBS distributed the programming. PBS and WGBH had a joint subscription to a viewing database. Boris visited our shop to automate WGBH's access to and reporting on the data. At that time, I realized that he was a good computer programmer and report designer. Before Boris' visit, Pat Harris, Boris' supervisor and The Director of Research at WGBH, requested that I help Boris with access to the database. She spoke positively of Boris and of his skills as a programmer.
- I was pleased to work with Boris again beginning in 2006 when TRAC acquired a company called PubTV—a company that contracted work to Audiresys.
- Boris is currently responsible for three distinct areas of ongoing responsibility for TRAC. In all of them, he uses software that makes his work self-sufficient and substantially reduces the amount of software development and staff time that TRAC is required to invest.
  - Every morning, Boris writes "Primetime Highlights"—an analysis of the previous night's audience performance of metered-market

public television stations. He posts this on the TRAC website along with summaries that are automatically generated by software that Boris developed and runs, daily. Approximately 50 clients rely on this service for timely news of PTV audiences. Boris has been doing this for PubTV, then TRAC, since fall 2004. TRAC would have great difficulty replacing this service. Boris' history with the data provides insights that could not be replaced. Also, we do not have software in place to perform the same analyses. At a minimum TRAC would sustain substantial additional costs in doing in replacing this service from Audiresys.

- In addition Boris produces weekly data analysis on a five-week rotating schedule for publication in TRAC's weekly newsletter, circulated among about 90 stations, producers and distributors. If Boris cannot do this, there would be most costs for TRAC.

- Boris conducts a comprehensive analysis and writes a report each television season for the number two public television distributor, American Public Television (APT). APT is one of TRAC's biggest clients. This "APT Season Review" requires several weeks of work using specialized software and procedures developed by Boris. He has been carrying out this annual commission since the 2003–2004 season. It would be very difficult if not impossible for TRAC to offer this service to APT without Boris. Furthermore, TRAC is in the process of transitioning away from the legacy software which will require addi-

tional research and preparatory work. If Boris were unable to complete this project, TRAC would be unable to provide this service and it would severely damage our relationship with APT.

- This is a time of economic challenge for PTV, and for TRAC. We are hoping that Boris' work on reporting systems for national producers and distributors could lead to new revenue streams for TRAC. Much of the work on these systems has already been done, but they will have to be completed, operated and maintained by Boris for this to happen.

I am aware of Boris' legal issues. However, I consider Boris to be a person who. is ethical and staunchly defends what he believes. I trust him and his company to diligently provide services for my company. He has always delivered a reliable and high-quality product. I am depending on that to continue in the future. I respectfully request that the welfare of TRAC Media Services and its clients be considered in Boris' sentencing.

Respectfully,

Craig C. Reed

President

TRAC Media Services

### EXHIBIT 15

New York, April 12, 2010

To Whom It May Concern:

This letter serves the purpose to commend the work of Boris Levitin

For the past 2 years Mr. Levitin has worked with DIRECTV Latin America

**140**

(DTVLA) on a consulting basis providing critical support to our audience measurement project: Viewer Data Collection (VDC ™).

His services included supervision of quality control of VDC, auditing our system, developing over 600 monthly-custom-made-automatic reports which is closely read and used by our upper management as well as our local offices in-country.

VDC is a one of a kind tool and remains still the largest digital audience measurement project in Latin America. As one of the co-creators of VDC, and with over 10 years of digital audience measurement, I can confidently affirm that Mr. Levitin's support over the past two years have helped take our project to heights which were unimaginable. In my professional estimation, he is without a margin of a doubt one of the most competent, thorough, scientific and honest professionals I have ever had the honor to work with and, most importantly, learn from.

His work ethic is exemplary. He handles extremely complex projects and timelines and fulfills them with a higher level of professional excellence.

Without equivocation, Mr. Levitin's contribution have proven immensely beneficial for DTVLA's Research & Intelligence department.

I enthusiastically endorse his qualifications and professionalism without any hesitation.

Kindest regards,

Sandro Mesquita

Director of Research & Intelligence

DIRECTV Latin America

### EXHIBIT 16

1 June 2010

Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

Joseph Moakley Courthouse

One Courthouse Way

Boston, MA 02210

Re: Mr. Boris Levitin

Your Honor:

My name is Bernard Sucher. I am an American businessman who since 1993 has lived and worked in Moscow, Russia. By way of further background, let me say that over that time, I have been engaged in a wide spread of entrepreneurial, philanthropic and community activities. These include: co-founding a business that became Russia's largest domestic investment bank, building a leading local mutual fund manager, opening a chain of American restaurants and one of Moscow's first international-standard fitness clubs, and pioneering essential financial market and corporate governance standards. I am a member of the Executive Board of the Washington DC-based US–Russia Business Council, a 2002 Crown Fellow with the Aspen Institute, and a Trustee of the European University of St. Petersburg, Currently, I am completing my tenure as the Country Executive for the local operations of Merrill Lynch, a subsidiary of Bank, of America.

Of immediate relevance, my first venture in Russia was to serve as an "angel" investor in the country's original, private-sector medical publishing house, Practica. This led, among other things, to my acquaintance with Boris Levitin.

For fourteen years, Boris has been responsible for Practica's relations with the Western publishers from which it licenses its books. Boris' skill and dedication to this work made him one of my business partners. His personal qualities made him my friend. So it was with astonishment

and sadness that I learned of the criminal charges against Boris. I write today to offer Your Honor some insight into the man you must now sentence.

It could hardly be said that Boris works for Practica because of the money. I thought of my original "investment" in Practica as a charitable contribution to a good cause. The venture has survived these tumultuous years as a kind of non-profit collective. Several dozen aging medical professionals produce what are arguably the highest quality medical texts available in the Russian language. Boris' role is to source the original intellectual property (almost always of American provenance) and to secure the necessary legal rights to translate, reproduce and distribute. This is serious specialized work, the fees for which over the years amount to many tens of thousands of dollars. Practica has rarely been in a position to compensate Boris appropriately, and it is typical of Boris that he has consistently subordinated his own interests so that the firm can make its Russian payroll. Even after he was laid off from his workplace of almost two decades, WGBH, in early 2004, and when he was crushed by the expenses resulting from the matter before you, Boris persisted in deferring compensation for his essential work. His personal sacrifice contributes dollar for dollar to the welfare of his colleagues. I believe that Boris pursues this path both because of a generous character as well as a genuine personal commitment to helping people in the country of his birth. Practica's books really do save lives.

In a more commercial setting, I have seen Boris' sense of professionalism and business ethics lead to results that may bear on the case before you. After Boris was laid off in 2004, I hired him to develop graphic collateral and information systems at Alfa Capital, a local fund management business, which I ran as executive chairman. Typically for such matters, our side's specifications for the project proved inadequate. The usual result is that the developer delivers a product that doesn't meet the actual need, and the two sides argue over who should pay additional costs to make up for the original error. That is not how it worked with Boris. He wanted the thing to be *right*. So, without being asked and at his own expense (time, of course, being money), he rewrote that particular system several times. Further, Boris provided extensive support to correct configuration problems caused by my own IT staff. In the end, my company got what it needed; Boris earned a sense of accomplishment and some money. Another craftsman, however—especially one who had just lost his established, steady income—would have bargained harder in his self-interest.

Whatever this personal quality of Boris is, maybe a certain naivete, it soon manifested itself again. Given our unsatisfactory experience, we subsequently upgraded our IT team (Boris actually advised us). This had the effect of greatly reducing the previously keen need for his services. Seeing this, and while he had a firm contract in hand, Boris nonetheless agreed to curtail our payment to him of his monthly service retainer.

I bring these experiences to your attention because they are entirely inconsistent with the notion that Boris would deliberately set out to steal or to commit a crime. What I have seen with my own eyes, however, is Boris erring in his judgment of commercial situations where his personal relationships are in play. The results have been that Boris underestimated his own worth and sacrificing—perhaps foolishly—for others. With hindsight, it is not at all difficult to imagine a deliberately devious

person manipulating Boris, despite his considerable intelligence, even for years.

I know that Boris was horrified when he was left with funds advanced for work that he could no longer fulfill. I know this because he called me looking for new projects as soon as Dunkin' Brands demanded a refund. Unfortunately, I was no longer in a position to help him find additional business. It was a relief to learn later that Boris ultimately was able to satisfy his responsibility to his client.

I trust that Your Honor will observe that the man standing before you at sentencing is not a run-of-the-mill white-collar offender. Boris, for his part, has demonstrated to me in the past qualities that we usually would admire, but which evidently have proven to be in this case unfortunate weaknesses. Under great pressure, my friend has made a sequence of errors of judgment that caused unintended consequences. I know Boris deeply regrets these events and that he has gone to great lengths to correct what can be fixed.

I respectfully ask Your Honor to consider these factors, as well as the continuing value represented by Boris' professional work at Practica Publishers, in pronouncing your sentence on him.

Sincerely.

Bernard Sucher

[redacted]

**EXHIBIT 17**

**EXHIBIT 18**

The Hon. Joseph L. Tauro
Senior United States District Judge
District of Massachusetts
John Moakley Courthouse
1 Courthouse Way
Boston, MA 02210
May 30, 2010

Your Honor:

My name is Steve Schwartz. I am a jazz host/producer for WGBH Radio, 89.7 FM in Boston. Boris Levitin and I have been friends since shortly after he was assigned responsibility for the audience research service to the Radio department in 1988. We have continued to see each other after

his layoff from WGBH, along with half his department's staff, in early 2004, and remain friends today.

Boris cares passionately not only about his work but about the mission of public broadcasting, to which he remains devoted even now. In this, he is different from other researchers and research—driven executives in public radio, who tend to program by the numbers and over the past two decades have ripped out the soul from many if not most of its stations. Boris is a big reason why WGBH—FM has not succumbed to this trend long ago. He believes that jazz, which has been almost entirely evicted from radio, can and should be presented successfully, and he loves it as a uniquely American art form. I wish that other public radio professionals cared this much about what they put on the air.

When he was still at WGBH, Boris seemed to all but live there, often still working in his office late at night. He would frequently visit me in the studio, usually as I wrapped up my show at midnight or 1am. We talked about everything—he is fantastically knowledgeable about even the most obscure subjects—but mostly about radio programming and jazz.

Boris has proven a friend in need as well. Early on, he helped me design and network a database for my recording library. Since then, I called on him innumerable times for help with my computer systems and he always responded as if it were an emergency, coming to my home and often working late into the night or the early morning. His work has always been outstanding and perfectionist.

I was in shock when Boris told me about the criminal charges against him. He is not at all someone I would associate with wrongdoing. On the contrary, he has in my experience been a highly scrupulous, conscientious man who gives of himself regardless of money. But I can easily understand how a soft, kind-hearted person like him can make bad decisions under extreme pressure.

Boris is utterly tortured over the choices he had made and their unintended consequences. He is heavily in debt, the state of his health is atrocious, and his professional future, which means life itself to him, is also under the sword of Damocles that your honor controls. I respectfully ask your honor to recognize the nature of the person you are sentencing, to prevent his mistakes from doing even more damage than they've done already, and to save his life.

Sincerely,

Steve Schwartz

[redacted]

### EXHIBIT 19

June 23th, 2010

The Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

Joseph Moakley Courthouse

One Courthouse Way

Boston, MA 02210

Your Honor,

I am the Director of New Media for Radio and Television at WGBH in Boston, I have worked at various jobs and increasing levels of responsibility there for 26 years. I also teach a class at NEU titled Music Production for Radio and the Web.

I first met Boris while Producer of Radio Special Projects, three years into my work at WGBH, when Boris began to provide rating information to the Radio management team.

During this time, when we often worked closely together, I saw Boris continuously

demonstrate high professionalism and dedication to the mission of public broadcasting. To Boris, like many of my colleagues, the work was more than a job.

The other senior managers who worked directly with Boris Pat Harris and Luiz Duarte were greatly respected in the industry with high professional and personal standards for themselves and their employees.

Boris possesses and continually demonstrated extremely high intelligence, but often paired with a social naivete. He was sometimes unable to make good judgments of the character or motivation of others. His worldview was simplistic and idealistic, the lack of 'street smarts' in sharp contrast to the formidable analytical intelligence. I also sensed a loneliness that this had created, and he seemed at times vulnerable to the machinations of others.

I have been informed that he has pled guilty to serious charges, and am given to understand that this trouble stems from misplaced trust, which is fitting, given my previous interactions with him.

I continue to have a high opinion of Boris and believe he possesses a strong moral compass. I would ask that you consider this letter, and allow Boris to not be destroyed professionally or personally from these recent mistakes, so he can continue to contribute his energies and talents productively.

Sincerely,

Robert Lyons

[redacted]

Westwood, MA

### EXHIBIT 20

The Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

Joseph Moakley Courthouse

One Courthouse Way

Boston, MA 02210

Your Honor,

My Name is David Olson and I am Network and Systems Administrator at WGBH Educational Foundation. I have been with the Foundation for the past 21 years.

I began as Night Operator in IT with a 2pm to 10pm shift. It was during this time that I met Boris. He worked well into the night, every night, and often was hard at work when I left sometimes after Midnight.

As I progressed at WGBH through desktop and network support roles I had many occasions to work directly with him as he was one of our first IT contacts. Boris would usually handle his users' desktop and software support needs without needing assistance from IT—a trait which was well-appreciated.

Within the first few year of meeting Boris we became friends. We share the same dedication to WGBH and Public Broadcasting. After he discovered that he had been laid-off, he worked with IT to hand over management of his hand-built systems so that there would be no interruption in service to his department and to WGBH as a whole. After his departure he assisted with questions and configuration needs many times—he always made himself available to us and did not ask for any recompense.

Boris has always demonstrated himself to be a conscientious, dedicated, professional. At WGBH he often fought for his department's needs and would stand behind a process or idea that he saw as right, rather than merely 'going with the flow'. He is the type of worker who steadfastly puts in long hours to make sure that a job is

complete. It is not a surprise to me that he stayed in service to public television even after having been laid-off from the Foundation.

Boris is, however, sometimes hobbled by his inability to clearly read people and their goals. I've seen him stand by his loyalty even when it has been obvious to those around him that he was being used. His dedication to friends and co-workers is entirely commendable, but is sometimes misplaced due to his naivete.

I understand that Boris has pled guilty to mail fraud. Hearing that was a great surprise to me. I've never, in the 20 years that I've known him, imagined that he could be caught up in such a mess.

I believe that, in the wake of this plea, Boris is mired in self-doubt and disgust at his errors in judgement. Boris is a person whose work means everything to him. He places his professional life above all else and it is in his work that he finds pride and worth.

Boris is a man who has much to offer society; he is intelligent, dedicated, and caring. It would be an immense shame to see that go to waste.

Sincerely,

David Olson

[redacted]

## EXHIBIT 21

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

1 Courthouse Way

Boston, MA 02110

May 26, 2010

Your Honor:

My name is Lindsay Ellison; I am a producer and voice artist. I am writing on behalf of my good friend and former colleague whom I have known since 1987, Boris Levitin, when we both worked for the WGBH Educational Foundation and were assigned to work together on a unique and important project for the good of the whole public radio system. I found Boris to be highly professional, a man with technical prowess yet very humble, one with a distinguished style who believed deeply in the mission of public broadcasting. WGBH was Boris's workplace of choice, not just a job. Indeed, after 17 years with the Foundation he has continued to serve that cause and does so even now, for the 24th consecutive year.

I trusted him immediately and he soon became one of my best friends. I could call on him at any time to assist with me any small or large technical problems. As a friend, many times he spent literally hours with me on the phone patiently talking me through a computer logistics problem. He saved the small record company where I worked after WGBH a lot of money and time by being willing as my friend to network the promotions department on their computers—an idea that he thought of and instrumented while taking no credit for his genius.

Whenever he came to my house he was welcomed heartily by my son and well liked by many of my son's friends. Boris is still named as the best guest and visitor ever by them. My son, a graduate of Swarthmore College and now off to University of Chicago Booth Business school was always impressed when listening to and learning from Boris. He always knew we could count on Boris to be honest, hardworking and helpful and always with a twinkle of humor.

I know about the criminal charges against Boris and the serious error in judgment

that he has made. I am deeply sorry for Boris that his innate kindness and willingness to assist others in need made him the victim of another person's manipulative wrongdoings. [redacted]

[redacted] Boris was the first person I asked to help me on a project to benefit battered women—the intent of which was to create a counseling program for battered partners at a food bank and women's shelter. [redacted] Boris was happy to give his artistic and technical expertise, without charge, and was instrumental in the proper presentation and promotion of what turned out to be a successful event at the Cambridge Multicultural Arts Center—an event in which much of the community was involved. [redacted]

[redacted] I can readily see how a moral, honest, gentle soul like Boris could be easily duped by the façade of love and care. It can happen to many of us.

Your Honor, I cannot fathom what would happen to such a gentle soul as Boris in jail especially in light of his extreme health issues which worry me considerably. I am asking that you exercise extreme compassion and care in Boris's case, as it is well deserved [redacted] thank you wholeheartedly for your compassionate and open-minded consideration.

Sincerely,

Lindsay Ellison

[redacted]

### EXHIBIT 22

[redacted]

Brookline, MA 02246

[redacted]

June 15, 2010

Honorable Judge Joseph L. Tauro

Joseph Moakley Courthouse

One Courthouse Way

Boston, MA 02210

Re: *Boris Levitin*

Dear Judge Tauro:

I am a friend and former work colleague of Boris Levitin.

I've known Boris for twenty-three years. We worked together at the WGBH Educational Foundation where he did statistical research on viewership of WGBH-produced public television programs (one-third of public television programs are produced by WGBH). I am a Deputy General Counsel at WGBH, however, I write this letter solely as an individual and not as a representative of WGBH.

Boris assisted me on a number of matters relating to ratings for some of our shows. Throughout my many dealings with Boris I found him to be a forthright, honest, reliable, and decent man. For most of his years at WGBH he worked for Patricia Harris, who was one of the most respected ratings analysts for public television programming in the country. Pat Harris thought very highly of Boris and they worked very well together until she passed away in 2003.

Boris took the time to help me on a number of technical computer issues that arose over the years. He was particularly helpful to me on a program called "Quick Dex," an early electronic rolodex system.

Besides spending time together at work, Boris and I have shared meals outside of the office throughout the years. I enjoy his company and I respect him. He's told me about the charges against him and explained how he became involved. He knows he made some very bad decisions under a great deal of pressure, and tells me that he has resolved to correct the damage he has caused. I continue to think of him as a good man who will take re-

sponsibility for his actions and his mistakes.

On behalf of Boris, I ask that he not be sent to prison.

Thank you for your consideration.

Sincerely yours,

Jeffery Garmel

## EXHIBIT 23

The Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

1 Courthouse Way

Boston, MA 02210

June 17, 2010

Your Honor:

I met Boris Levitin in 2004. At that time I was the General Manager of a furniture distribution company. My firm had a collection of computers with which we placed orders for our dealers, tracked shipments, ran our accounting system, hosted our Web site, and performed every other critical function of a modern business.

One day our computer system stopped working. We called a local company for technical support and were fortunate to have Boris come to our office. He spent many hours that day restoring our system back to life. Then over the next several days he configured our computers and network so all of it was easier to use and less likely to fail.

For many months, he was the only computer professional we used. When the support firm we used went out of business and left us high and dry; Boris stepped in and told us he would personally continue to maintain our computers. Whenever we had any problem, all we had to do was call him and he would be in our office the same day to fix it.

At all times he was the consummate professional, courteous, helpful and completely knowledgeable. I have gladly recommended him to firms that needed either computer hardware and network solutions or market data analysis. My company continued to use Boris Levitin exclusively for our computer systems support until we closed in the summer of 2006.

Since then I have maintained a professional contact with Boris networking with him and meeting to discuss business opportunities. Frankly, I find him to be a worthwhile friend as well, with admirable character and generous nature. When he told me of his indictment, the shock and disbelief I experienced was monumental. I still cannot believe he has gotten mixed up in such a serious situation. I know Boris is a good person and I believe that he behaved stupidly, possibly because of his overly trusting nature.

Nothing about this current situation, however, changes my rock solid understanding of his good nature, which I believe he has continued to demonstrate. I consider him the same honest, hard working person I have always known. I would gladly work with him again. He has repeatedly expressed grave regret for everything that has happened. Furthermore, knowing Boris, I believe the stress of this situation has taken a toll on his health.

Thank you for considering my request for just treatment for a dear friend of mine and a solid member of the community. If you need to contact me for any additional information please feel free to call me at [redacted] Thank you.

Sincerely.

Thomas Narcavage

## EXHIBIT 24

Antony Partensky

[redacted]

Needham, MA 02494

June 1, 2010

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

1 Courthouse Way

Boston, MA 02110

Your Honor

I am writing to you on behalf of my old friend and colleague Boris Levitin. In this letter I hope to extend my vote of confidence in Boris as an honest and productive citizen, a knowledgeable professional, and a good, dependable friend.

I first met Boris in 2003, when I was a young IT professional struggling to cope with the repercussions of the dotcom bust. I was trying to get my own consulting practice off the ground and Boris proved to be an invaluable resource. He gave me advice on many business and technical aspects from marketing and customer relations to business attire and communication. In a way he became a mentor that every young person so needs when striking out on their own.

In 2004 I hired Boris' services as I was not able to keep up with the growing business demand. I found Boris a very reliable, thorough, and skilled professional—a pleasure to do business with. When I sent Boris to a client I never had to worry; they were always satisfied and had nothing but positive feedback. At the same time, I could always count on Boris to keep me informed and consult with me if there were any issues or even new business opportunities. Thanks to the trust we have developed over the years I never had to worry

about Boris competing with me for my business.

I am no longer consulting, but if I were I would definitely like to work with Boris again.

Boris is also a compassionate and understanding friend. Boris and I have spent numerous hours discussing cultural differences between America and Russia, my home country. Boris is always very proud to be an American. "I wanted to live in this country since I was seven years old" he used to say. He's lived in Russia and Israel and is convinced that democracy, the way Americans practice it, is the best form of government. His high regard for this country and its culture helped me make a cultural adjustment as well.

What I wish to convey in this letter is that Boris has unconditionally extended his help to me many times. And I am disappointed to find him in such difficult circumstances. But I will always value him as person, a colleague, and a friend.

Sincerely,

Antony Partensky

## EXHIBIT 25

Konstantin Aizikov, Ph.D.

[redacted]

Brighton, MA 02135

[redacted]

April 21, 2010

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

Your Honor:

My name is Konstantin Aizikov. I recently defended my Ph.D. in Electrical and Computer Systems Engineering at Boston

University. Boris Levitin has been a good friend of mine for many years. I have known Boris's father for a long time as well. Lev B. Levitin has been my academic advisor and business partner in a high-technology startup.

Throughout our friendship Boris has been a loyal, faithful, and supportive friend. In my experience he has proven to be an entirely honest and upstanding person. I am perfectly aware of all the charges made against him, but they do not change my view of him. It is because I've known him as a thoroughly reliable and moral person that I have accepted his offer of collaboration.

Currently Boris is providing me with employment as a database development specialist through his company Audiresys, Inc., to create, maintain and support a database and several associated systems for DIRECTV Latin America. When complete, this database will store multiple waves of customer-survey fieldwork. I am also required to develop a system to identify fieldwork questions and answers so that future data can be combined with the correct existing data; and yet another major part of the project is to create middleware between the database and existing front-end software.

I am otherwise employed in a low-paying job that I took so as to have the time to finish my dissertation research, and in a few months expect to move to a postdoctoral research position, necessary to advance my future as a scientist. Both those jobs pay very modestly. I am a recent father and the sole provider for a family of three. It is imperative for our financial well-being that I keep my employment with Boris's company, which, like the project, is ongoing.

I therefore respectfully ask you to consider my and my family's future in making your decision on Boris's.

Sincerely yours,

Konstantin Aizikov, Ph.D.

### EXHIBIT 26

Elena S. Morzhina

[redacted]

Medford, MA 02155

[redacted]

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

March 16, 2010

Your Honor:

My name is Elena Morzhina. I am pursuing a Master's degree in bioinformatics at Northeastern University. I met Boris Levitin four years ago through a friend of mine. We became closer when I started to work for his firm, Audiresys, around two years ago. Our relationship began to progress vividly during that time. By now we are very in love and I care for this person more then for anyone. I need him in my life as he is my love my support, and my dear friend.

I clearly realize that Boris is in deep trouble. I have been following the latest news of this story since it started. I am writing this letter to state that Boris is a kind and very generous person who can be easily taken advantage of. I sincerely hope that he will be penalized as little as possible in this vulgar and absurd situation.

Boris is a type of person whom anyone can rely on. I know that since being his girlfriend I have learned of him like no one

else. He is a friend whom you can call any time of day to ask any question or favor and be sure to get help with it. My current bioinformatics studies have exposed me, a biologist, to much that was new and challenging on the discipline's informatics side, and I have often called on his help in this field. He invariably, patiently pointed me to the correct steps to take in mastering the relevant concepts, even when my professors didn't.

Boris is also a friend who will be supportive in times of sorrow and danger no matter how busy he is or how much work he has. Boris is a very honest person, too. He, however, manages to stay incredibly polite. As a friend, in my times of trouble, sometimes he would give me his opinions; these were very informative, funny but would still stay at a level of constructive criticism. In our relationship, Boris is a friend who is a warm, soft and a very gentle person.

Boris is also a mentor to me. Throughout the time that I have known him, I was happy to learn that his calm character is not easily shaken. On several occasions, I had to work long hours on a complex technical project that was very unclear to me. In these situations I used to grow very tired, uninterested and finally frustrated. Despite this, Boris always stayed calm and cool in explaining the details of the project and never raised his voice or fired me even though at times that would have been understandable. He was confident that I would finally grasp the relevant concepts, and, encouraged by his belief in me, I did, so that he did not have to unfold them for me again. His incredible self-possession inspires me because now I realize that only with that temperament you can accomplish the impossible.

Today I can say that I have acquired a significant amount of knowledge from Boris, notably how to accomplish difficult projects. I've had to prepare the consumer-behavior basis for the 2010 World Cup advertising sales effort of Audiresys client DIRECTV Panamericana. 1 conducted the data mining and, together with Boris, delivered ready-to-use presentations with business cases targeting specific prospective buyers. Currently, I am working on a spin-off effort to segment DIRECTV'S advertising inventory by demographics and establish the business case for each segment. The number of channels with which DIRECTV has advertising insertion agreements is continuing to grow, so I expect to continue working with Boris on these projects.

The income from this work is essential to me because I am a full-time student. I therefore request that, in addition to his human qualities, this be kindly considered when a decision is made on his fate, because his inability to work will eliminate an important source of my earnings.

Boris is a very special person in my life. Indeed we have become romantically involved. I expect that I'm far from the only one who is greatly alarmed that he may go to prison and that his professional life, his livelihood and his very shaky health will be destroyed. There are many people who depend on him and need his support. For the past four years, I've had to see him suffer, filled with regret by the bad choices he stupidly made, dejected by the fact that he has been fooled by a person who completely abused his great and genuine personality, but nevertheless determined to keep going. I say to Your Honor with all possible respect: Boris has already been punished plenty and deserves no more.

Sincerely,

Elena Morzhina

152

## EXHIBIT 27

Sergei Ioannisyan

[redacted]

Somerville, MA 02143

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

March 23, 2010

Your Honor:

My name is Sergei Ioannisyan. I am a professional musician, performer and a music educator. I work at Berklee College of Music and perform in the U.S. and abroad. I am a close friend of Boris Levitin.

Boris Levitin is the most decent, generous, kind, sincere, intelligent and honest person I've ever known. Boris is a great intellectual and extremely well educated overall. Whenever I have any question regarding anything, I know, that I can always count on Boris. He always gets back to me right away and spends as much time as needed to trying to help.

Boris has always helped me, my family and many people I know. [redacted] asked Boris for help. Without any trace of hesitation, he agreed to help me. He researched the complex visa application process, found a competent lawyer specializing in such matters, drove me to the initial meeting with him and ensured that I asked the right questions.

Boris loves the arts and has always been supportive of my music career. About 10 years ago, I was working on my music album. After recording it at a studio and spending all of my money for the recording and the musicians on the album, I had no money left. I still needed a design for my new CD to make it presentable. When Boris found out that I had no money for the design, he took the job of making the design for my new CD and its case at his own expense. He spent a lot of time doing this design, and at the end he did not charge me a penny. Boris has come to many of my music concerts and has been a great mentor to me.

One time I needed a ride to Boston Logan Airport. At that time I was staying in Rhode Island. With his busy schedule, Boris came all the way from Boston to Rhode Island, just to pick me up and take me to Logan Airport. It was about one hour and a half one way! He did not even ask me for any money for the gas to compensate his long trip.

About 9 years ago, I lived in Plymouth. During that time, I once flew from Europe to the US. After my long international flight, I was exhausted. Boris picked me up from the Logan airport and took me all the way to Plymouth. Again, he did not charge me any money for the gas or his time at all! Instead, he took me to a nice restaurant and fed me. He paid for all the food. On other occasions, when I was travelling, I would ask Boris if he could pick me up at the Logan airport and he always did. A particularly astonishing situation occurred when Boston had a major snowstorm and my flight was diverted to Toronto, where it was repeatedly delayed. Boris drove through the storm, on almost empty roads, three times to the airport to pick me up. He did this on his own initiative as I was unable to reach him by phone.

[redacted]

Boris is a perfect example of how real friends are and should be.

Boris is a great human being, I really pray that Boris will stay with us in our community, so he can keep on helping people as he always did. We all really need him.

Sincerely,

Sergei Ioannisyan.

### EXHIBIT 28

Dr. Natasha Markuzon

[redacted]

Newton, MA 02461

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

March 23, 2010

Your Honor:

My name is Natasha Markuzon. I have a Ph.D. in Cognitive and Neural Systems. I am specializing in developing mathematical models for the medical, space, and defense industries at Draper Laboratories.

I am writing to express my support for Boris Levitin who has been my friend for the last 20 years. I came to Boston to study in graduate school in 1990, less than a year after emigrating from Russia. Boris and his father were among very few people whom I knew at the time in Boston, and Boris showed a lot of kindness and help while I struggled to establish myself in a new country. Among other things, Boris was my informal tutor in English, reading and correcting my papers, and later proofreading my thesis. In later years, he became the first person to call if any trouble with my computer arose. Boris was always willing to spend hours to help me with my frequently malfunctioning computer. Once he spent an evening and managed to fix a truly intractable problem that had defeated several computer science professionals.

I have always known Boris as a law abiding and very decent person. His in-volvement in a Russian publishing company specializing in medical literature has demonstrated big concern for the cause with little interest in monetary gain. The company, organized by our mutual friend, was among the first in Russia to publish much-needed contemporary medical literature. Boris knew that profits would be very low but still wanted to offer his services to struggling friends.

In all, I consider Boris to be a very truthful, honest and caring person. I strongly believe it is out of his character and nature to commit crime. It is unthinkable to me that Boris will end up before the court again. In my opinion, which I respectfully submit to the court, Boris does not deserve to have his life destroyed by imprisonment. I will be glad to provide any additional help if needed.

Sincerely,

Natasha Markuzon

### EXHIBIT 29

Maxim Lubarsky

[redacted]

Waltham, MA 02453

[redacted]

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

March 25, 2010

Your Honor,

I am writing on behalf of one of my closest friends Boris Levitin. I have known Boris for almost nine years and can say with absolute confidence that he is one of the most honest, dedicated and loyal people I know. Besides being my friend he is also a close friend of my family and a very frequent guest at our house.

I have met Boris in 2001 when I just came to this country from Ukraine. Being a foreigner I found it very important to have someone I could turn to for advice. Since the first day, Boris was the most helpful and desiring to help person I knew. And whatever problem or question I had, he would go above and beyond to be of assistance.

Besides knowing Boris as a great friend, I had a chance to work with him professionally. I am a recording artist and Boris was a designer for my first CD and its case as well as an adviser for my website. I can positively say that it would be hard to find a more thorough, dedicated, creative and professional individual. All this work Boris did as a friend with no compensation. Normally this job would have cost well over $1000 at the least.

After being a close friend of Boris for so many years I can assure you that Boris is extremely honest, sometimes even naïve person. And some people can easily take advantage of it.

I hope that you will find this information useful when considering Boris' sentence. I am happy to be of help in this matter and will be glad to provide any further assistance if needed.

Respectfully,

Maxim Lubarsky

www.maximlubarsky.com

## EXHIBIT 30

Elena Ioannisyan

[redacted]

Somerville, MA 02143

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

March 23, 2010

Your Honor:

My name is Elena Ioannisyan. I am a performer and a music educator. I work at Children's Montessori School in Littleton and I study for my post-Master's degree at the Boston Conservatory.

Boris Levitin is a close friend of my husband and me.

First of all, I wanted to tell about Boris as a human being.

I met Boris about five or six years ago when he was visiting St. Petersburg, Russia, where I lived at that time. Boris is a friend of my husband and we all spent a good time together. We went to the Hermitage and other museums and cathedrals to see works of art together. Boris and I became friends right away and later when I came to the US, Boris has become one of my closest and dearest friends.

[redacted]

All I can say about Boris is good things. He is an incredibly kind, loving, humorous and intelligent person.

He likes the arts and has always come to my and my husband's concerts to support us. Boris has always offered us all kinds of possible support. I know that Boris has done a great deal of good for other people as well. He makes the world a better place!

Sincerely,

Elena Ioannisyan.

## EXHIBIT 31

To:

Hon. Joseph Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, Massachusetts 02210

I have the privilege of knowing Boris Levitin for almost 20 years and knowing him quite close for the last 15 years. When I learned about that terrible, unexpected, and so contradictive to everything I know of Boris, episode, I was very upset and surprised. One thing I would never associate Boris with is unlawful activity of any kind.

On a personal level Boris is an honest, sometimes painfully so, very friendly and pleasant person. He carries an aura of benignity and goodness around him. He is always ready to help in any possible way he can. Many times I turned to him when I needed a ride (sometimes quite late at night) or any help related to the English language or advice on almost any question and always received eager and thorough help from him. Boris always is ready to share a meal with a friend and always is very hospitable even if it is not in his home. He is very well versed in music and art. His two cats are probably the most loved and taken care of cats in the world. Boris is widely educated and is a very interesting person to talk to.

Work for Boris is a very important and meaningful part of his life. He always holds it as his first priority. Having lost his longtime manager and mentor to cancer, Boris had to leave his job in public television after 17 years and to expand his own business. Although he has many serious health issues, his health never interfered with the quality and efficiency of his work. I know that he was and is working late at night and sometimes through the night altogether in order to provide timely and professional services to his clients and collaborators. Boris is very competent in several areas—he is a leading specialist in broadcast audience research, a professional graphic designer, an excellent computer programmer and statistician, and is a very good researcher and analyst in several fields. At this point, as I know, Boris is involved in a very big and innovative project in which he is a key specialist and is practically irreplaceable. Boris is one of those who meet the definition of "workaholic" regardless of being of in poor health and of limited physical abilities.

When I learned about the episode that led to this unpleasant and difficult situation, I immediately knew that there must have been some personal feelings that dictated to Boris some of his regrettable steps. Boris is sometimes so eager to help a friend that he loses the bigger perspective. And also being a very softhearted person, he sometimes overreacts to unexpected threats or to any kind of aggressive behavior and loses the realistic view of the situation. As far as I know a mix of both these conditions was present when those regretful events happened.

Like every intellectual, Boris is good at learning from his mistakes and I am sure nothing like that will ever happen again, I am asking the court to take all this in consideration and make a decision that does not involve any jail time which would be devastating for Boris' health and may cause a collapse of a project that is very important for his client and for him personally. It also would be very sad for his relatives and his friends.

Anatoly Levin

Coordinator, Testing

Middlesex Community College

Bedford, MA

### EXHIBIT 32

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

1 Courthouse Way

Boston, MA 02210

May 10th, 2010

Your Honor,

My name is Julia Sedykh. I've known Boris for almost twenty years both as a close friend and as a colleague (I am a graphic designer and over the years we had many professional interactions).

I was shocked and in disbelief when I learned about Boris's troubles! I always thought of Boris as the most law-respecting citizen I knew, both in words and in deeds. If such thing could happen to Boris, it is only because he is just so trusting and naive.

Boris was always my great and devoted friend. Many times he offered his help—taking my visiting relatives around Boston or helping with my computer troubles. Boris is a truly caring person: he always asks how my sister in Russia is doing and how is the health of my parents-in-law. But, most important, I know he is always around to discuss my problems (mostly at my dining table well past midnight) and to apply his great sense of humor to a difficult situation. I also know that he is a very gentle and sensitive person. That's why it hurts me very much that he now is facing sentencing which could change his life so dramatically that it can even kill him, considering his poor health. The whole ordeal he has been through for the last couple of years, realizing in what troubles he has found himself, seems to be already a punishment in itself!

I am very happy to have an opportunity to write this letter now as, it seems, it is the only thing I can do to help in his troubles.

Julia Sedykh

[redacted]

Lexington, MA 02420

[redacted]

## EXHIBIT 33

From:

Dmitry Borkin

[redacted]

Quincy, MA 02171

[redacted]

To:

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

March 17, 2010

Your Honor:

I'm writing this letter in support of Boris Levitin. My name is Dmitry Borkin; I'm a Ph.D. student in Green Chemistry Synthesis at the University of Massachusetts, Boston. I met Boris right after my arrival in the U.S. to study in January 2008. Soon we became good friends. Sometimes he was the only one who could offer me a ride from the airport, restaurant etc., and he always did so when I needed it. Later, when I was depressed by personal problems, he used to take me out for lunch or ice cream that he paid for and dropped me back. I'm not an outgoing person and don't like anybody to be involved in my problems, but his care and support always cheer me up. We like to discuss everything around us including our life problems. He is very knowledgeable, and that makes him a good adviser in any life questions. Boris is a kind of person whom you can always rely on. I trust him entirely.

I've followed the details of this case and attended the court session when he pled

guilty to the charges against him. I will be at his sentencing in late June. From my point of view, Boris acted under the strong influence of his friend—Carolyn Kravetz. Boris had feelings for her, and she used this to manipulate him. I'm confident that he didn't wish to cause any adverse effects for Dunkin' Brands. Unfortunately he didn't realize at that time what kind of person she is. That's why he became involved in this situation. But there is no doubt that Boris Levitin is a good person and he wouldn't have done it in any other circumstances.

Boris is suffering tremendous regret and remorse about everything that occurred. But he does not deserve a punishment that will change the rest of his life and the life of all of his friends, relatives and coworkers.

Sincerely,

Dmitry Borkin

## EXHIBIT 34

[redacted]

Sudbury, MA 01776

[redacted]

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

1 Courthouse Way

Boston, MA 02110

May 11, 2010

Your Honor,

I am writing to you as a character witness for Boris Levitin and to ask you to show leniency when sentencing him.

I have known Mr. Levitin for the last 15 years, and he had always shown himself to be a kind, giving and compassionate human being.

15 years ago I arrived in the U.S. as a new immigrant who did not drive and whose English was very rudimentary. Through mutual friends I met Mr. Levitin who, over several months, stoically mentored me in American life, gave me rides when I needed them, helped me improve my English, translated my diplomas, taught me the art of resume-writing, and tried to help me to get my first job. He literally spent hours and hours helping, completely selflessly, without ever expecting any quid pro quo.

I am very grateful for Mr. Levitin's help, and will never forget the kindness he had shown to me and others (I know of a few other people who were helped by him in a similar fashion).

Based on my long history with Mr. Levitin, I view him as someone who has made an error in judgment, but who is still a good human being at heart and who feels genuine remorse over these mistakes.

Therefore I respectfully ask you to use maximum leniency allowed to you by law in sentencing Mr. Levitin.

Thank you,

Karina Keshishian

Senior Software Engineer

RSA Security, Inc.

## EXHIBIT 35

Boston University

College of Engineering

[redacted]

Boston, MA 02215–2421

158

Boston University

College of Engineering

Boston, MA 02215-2421

Electrical and Computer Engineering

Lev B. Levitin, Ph.D.

Distinguished Professor of Engineering Science

[redacted]

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

March 16, 2010

Your Honor:

I am Boris Levitin's father and have known him since his birth.

Since his childhood, I have always known Boris to be an honest and moral person, even when this might have unpleasant consequences for him.

Boris is a kind and generous person by nature. He likes to be helpful, and he is always ready to sacrifice his time, efforts and sometimes money to help others. Being an excellent information technology professional, he has helped many people with their computer problems. I would often witness him working late at night trying to fix somebody's system. Quite regularly, he helps elderly people in his community when they need a car ride. In a number of cases, he helped his friends and acquaintances financially.

One of our mutual friends is an elderly lady who suffers from sudden epilepsy like fits. On several occasions, I witnessed Boris literally carrying her in his hands, in order to deliver her to her home, a process that can take half an hour to negotiate one flight of steps.

At the same time, Boris sometimes is incredibly naive, and tends to see people as better than they are. Because of that, he has been vulnerable to abuse and been bitterly disappointed. I have told Boris many times that he should learn to tell good people from bad ones, and to discriminate between his friends and enemies. This inability may cause tragic consequences for him.

Another remarkable feature of Boris is his strong sense of responsibility. Being a perfectionist, he does his best and always seeks to fulfill his obligations to his employers, clients, friends, and any other individuals. From numerous personal conversations, I know that Boris was genuinely tortured when he could not fulfill his obligations to Dunkin' Brands until he could return all the money it paid him.

Being a hard-working and responsible person, Boris worked, for 17 years at the same place (WGBH). After he was laid off in 2004, Boris found himself in a very difficult financial situation. He made courageous efforts to expand his own business so as to make a living. During 2004–2005, Boris mentioned to me (without going into details) that he got a number of projects from a big company and was very busy with advancing them. Indeed, I observed him working hard many hours day-to-day on these projects, which included plenty of graphical work and research. Much later, I learned that these projects were ordered by Ms. Kravetz, who held an important executive position with Dunkin' Brands.

Based on 45 years of my first-hand knowledge of Boris, I am deeply convinced that he was lured into the unfortunate situation by his false "friend", Ms. Kravetz, who got him involved by deception and cruel manipulation of his emotions. Unfortunately, it was too late when he learned that Ms. Kravetz had been ordering projects without anyone's approval when she knew she was going to leave her employer.

Boris was shocked and devastated by the betrayal of a person whom he believed to be a close friend for 20 years. 1 saw him at that time deeply depressed. Full of remorse and desperation, he tried to correct the situation as much as he could. It took him enormous efforts to collect money, largely by borrowing from friends, to return the total amount that was paid to him by Dunkin' Brands, including the payments for projects that had been completed and delivered to that company, and including the monies Ms. Kravetz had extracted from him.

Boris found himself in a very difficult and shameful situation. His failure to recognize personal characteristics and intentions of other people resulted in wrong judgments and some irresponsible acts. After he realized that, he experienced a deep shock and was overwhelmed with grief, remorse, shame and regret. However, he fully accepted his responsibility and struggled valiantly to overcome the mistakes he made. Since he always has had an excellent reputation as a person of high moral qualities, his friends and clients supported and helped him. While facing the threat of criminal prosecution and. then the actual prosecution, he worked extremely hard to put his business back on its feet, and he succeeded in doing so. Now his business is in good shape, and he is even able to create jobs for others.

Despite all he has endured, Boris remains a productive and responsible member of society, as he always strived to be. He is a unique expert in his main field of work. Uninterrupted continuation of his professional activity is vitally important for his current clients. Moreover, it will allow him to fulfill his obligations to his friends (including me) who lent him money when he needed it to return to Dunkin' Brands.

I earnestly ask the Court to help Boris limit the damage from his mistakes and to allow him to continue serving his clients, building his business and fulfilling his obligations to those who trusted him and helped him.

Lev B. Levitin, Ph.D.

Distinguished Professor of Engineering Science, Boston University

Life Fellow, IEEE

Member, International Academy of Informatics

## EXHIBIT 36

May 29, 2010

Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

One Courthouse Way

Boston, MA 02210

Dear Judge Tauro:

I am writing you on behalf of our friend Boris Levitin. I have known Boris 15 to 16 years now. I became acquainted with Boris when he was a business colleague of my husband, Stephen Schwartz at WGBH around 1994. Steve and I were married in 1995, and I continued to meet up with Boris for technological consultations. Boris is to my best knowledge a very good man. He is extremely bright and capable. He has worked tirelessly for Steve and me with computer issues; often, late into the

evening until they were resolved. I have had dinners with him on multiple occasions and he always impresses me with his kindness as well as his breadth of knowledge on many subjects. I have continued to see Boris since his departure from WGBH.

I am most alarmed and shocked to hear of Boris's legal troubles. From conversations with Boris, I believe that he feels deep remorse for his errors in judgment, and has suffered greatly as a result. He particularly blames himself for failing to see through his friend of two decades, now his codefendant.

[redacted]

[redacted]

Failing to choose one's friends wisely, and failing to see through them, is a punishment in itself, and it be a a severe one. [redacted]

[redacted] His very life is now in danger because he chose a friend badly and could not see her for what she was.

I ask your honor that you please show compassion for Boris whom I believe strongly is a person of integrity that got tangled in a web of deceit, but imprisonment will completely destroy his life. I ask you to please show kindness and a merciful attitude towards our dear friend Boris.

Sincerely,

Constance Bigony

Visual arts specialist

Boston Public Schools.

## EXHIBIT 37

To:

Hon. Joseph Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, Massachusetts 02210

May 17, 2010

Your Honor:

I have known Boris Levitin for more than 12 years, and I am very proud to say that he is one of the kindest and most helpful people I have ever known.

Boris was always able to find time in his very busy schedule to give me a hand whenever I had problems with my computer or needed help with my English classes. Boris was always happy to give me a ride to or from my college or work when I did not have a car, and he still does so today when it's not available. He helped me to adjust to American life by sharing with me his vast knowledge of American culture, art, music, food, etc.

[redacted]

In addition to his humane qualities, Boris has always been to me a great example of a real professional who considers his job his highest priority in life. I regard him as a fine individual with a lot of potential for further professional growth. His unfortunate predicament has already caused him a great deal of regret and suffering. I respectfully ask your honor to consider this and to avoid destroying his professional future and very fragile health.

Sincerely,

Julia Levin, RN, BSN

[redacted]

Brookline, MA 02446

## EXHIBIT 38

Sandi J.M. Bonfiglio, B.F.A., M.Ed.

[redacted]

Boston, MA 02135–7225

Honorable Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

One Courthouse Way

Boston, MA 02210

Re: Boris Levitin

30 May 2010

Dear Judge Tauro:

I am writing this letter on behalf of my good friend Boris Levitin to attest to his good character.

I have known Boris since 1986. During this time we have worked together and have also done things as friends outside of work. He was friends with my (now ex) husband who also worked at WGBH and we frequently would be together at work-related and other functions. I introduced him to and he was accepted among my friends. He is a very true, generous to a fault, focused and well-directed friend; I value his friendship. He goes above and beyond the norm.

I worked at WGBH in Boston for over 10 years. I had many opportunities to work with Boris. After I left there, when I became a teacher, Boris was at my side. He helped me with the writing of my many papers, helped me financially (he generously lent me over a thousand dollars and never asked me for payment) as I tried to pass history certification and he was present, at my invitation, at my graduation from Lesley University.

He often worked endlessly and far into the night fixing and updating my old computer. I often went to bed while he stayed. In my experience, Boris is kind and helpful; he is anything but harmful or evil.

I do not believe that Boris would deliberately do anything outside of the law. He used to shudder in disbelief when I would tell "old family tales" and would often utter, "That is not legal." to which I would just laugh.

Boris is a walking encyclopaedia of information. Although he is sometimes adamant on his being correct, he always handles it well when he finds out he is incorrect. He exhibits a love of life, food, friends and a willingness to help others.

When I took my 1st teaching job overseas (a year in Egypt through the Council of International Schools) Boris helped me pack and even took me, my boxes and my dog to the airport. He has helped my brother, whom he has never even met. My mum thinks the world of him—they have met and he won her over with his honest charm and good outlook on the world.

I find it incredibly hard to believe he is in the mess he is at this time. From what I gather I can only surmise that he fell in love with the wrong woman and misjudged her true character. This can happen in such cases. Boris lends to be very naive in the relationship department; I can easily understand how he was used by this woman.

Please do not send him to prison. He is seriously ill. His professional life, the most important thing in his life, would be totally destroyed. His father is elderly. Boris is a good man. I and his many friends would miss him terribly if he were to become incarcerated, but I am much more concerned about what would happen to him afterwards.

Very truly yours.

Sandi Jane Mazza Bonfiglio

**EXHIBIT 39**

Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

One Courthouse Way

Boston, MA 02210

May 28, 2010

Your Honor,

My name is Alexei Tsiganov. I am a professional jazz performer, composer and educator. I have attended the Berklee College of Music and the New England Conservatory.

I've known Boris Levitin since 1993 (17 years) and in all this time I have never doubted his honesty and honorableness. Boris has a very friendly and unselfish personality and that's one of the reasons why he has many friends. He always helps people around him.

In the beginning of my life in the U.S., I was financially unstable and I did not have a car. Every time I needed to go somewhere not reachable by public transportation, Boris was always there to offer help. Knowing about my financial difficulties Boris invited me and my wife many, many times to various restaurants and paid for both of us. He helped me many times to care for my elderly grandmother, taking her to medical appointments and to the park just to walk with her when I was busy working. Although it's hard for him to lift heavy weights, every time he's been present when I had to move heavy equipment on my way to or from a concert, he would grab it and be done with the job before I could stop him, without ever being asked. Boris built my website and helped me maintain it for many years. He designed and printed the packaging for my first recording, spending hours late at night to get the color he intended to come out just right, in his workaholic, perfectionist way. In all these years, my computer malfunctioned on numerous occasions and Boris was always there to help me even when he was very busy with his own work. He has never asked me for anything in return.

I also witnessed Boris helping many people besides me, including some of my friends, building their websites, designing their CDs and their packaging, helping write resumes, fixing their computers, taking care of their parents, driving them... It is impossible for me to remember all the things he did for others, but there have been countless occasions.

I jokingly used to refer to him as a sponsor of the arts, a Medici. For some reason he hated that.

Your Honor, I understand that it may be difficult to give credit to the testimony of someone you don't know, but I must say with all my heart that Boris Levitin is one of the very best, honest and unselfish people I have ever met. He finds himself in a terrible situation now because of mistakes he made, which 1 believe he made because he was led by someone dishonest and was lied to. Despite this, I truly believe that Boris is very respectful of the law and incapable of lying or any dishonorable act on his own. Having made Incorrect choices, he is also the kind of person who will go to great lengths to mitigate their unintended consequences, and in fact, has done so in the case before you. I can only ask you: please do not destroy this kind and gentle man and his very worthwhile life.

Sincerely,

Alexei Tsiganov

[redacted]

### EXHIBIT 40

Hon. Joseph L. Tauro

Senior U.S. District Judge

District of Massachusetts

One Courthouse Way

Boston, MA 02210

May 25, 2010

I am writing this letter in support of Boris Levitin. I met Boris when I began working with him at WGBH in 2002, and we have remained friends since that time. As a colleague, Boris was always extremely helpful, insightful and supportive.

Boris and I remained friends after leaving WGBH, and, after completing a Master of Public Health, I moved out of state and began working at a small business that conducted psychiatric clinical research. The company was suffering from the poor economic climate, and when we were trying to streamline some of our processes in order to stay afloat, I mentioned to Boris that we needed an electronic patient scheduling system. He offered to create a program at no charge to the struggling company. The program proved reliable and easy to use. This is just one example of how Boris has gone out of his way to help a friend in need or just do whatever he could to serve a good cause.

I have known Boris for nearly a decade. He's one of the most caring individuals I've ever met, and I know that he genuinely regrets all that has happened—and, in particular, he regrets that projects for which he was responsible were not completed. I've always known Boris to produce consistent, high-quality, complete work.

It is for these reasons that I am asking you to impose a sentence that does not require my friend and former colleague to go to prison.

Sincerely,

Amy Gross

[redacted]

### EXHIBIT 41

Hon. Joseph L. Tauro

Senior U.S. District Judge

District of Massachusetts

One Courthouse Way

Boston, MA 02210

May 25, 2010

Your Honor:

I am writing in support of Boris Levitin in the sentencing phase of this proceeding. I am a member of the Massachusetts Bar, the South Carolina Bar and the District of Columbia Bar. I have known Boris since I was a law student in Boston, MA.

When I first met Boris, he was working at WGBH. It did not take long to realize that Boris is an intelligent and caring person who is more concerned about others' well-being than his own.

After leaving Boston, I moved to Charleston, South Carolina to work as the attorney for the Center for Heirs' Property Preservation, a non-profit organization that provides free legal services to indigent heirs property owners at risk for losing their family land. One of the major challenges I faced was keeping track of hundreds of heirs and calculating their intestate interest. The development companies who were acquiring most of this land could afford sophisticated software that could accomplish this task. The organization I worked for could not. Boris offered to create such software and provide it to the organization at no cost. He worked quickly and diligently on this project until it was complete and then provided IT support, also at no cost.

I sincerely believe that if you impose a non-prison sentence on Boris, he will use the opportunity to assist other non-profit and community causes as he did through me and my wife.

I've had many conversations with Boris concerning this case and I believe that he deeply regrets how the situation unfolded. Respectfully submitted by:

Daniel A. Gross, Esq.

[redacted]

### EXHIBIT 42

Anna Lubarsky

[redacted]

Waltham, MA 02453

[redacted]

March 24, 2010

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

Your Honor,

I am writing on behalf of my very dear friend Boris Levitin. I met Boris eight years ago when I just started dating my husband, Maxim, who introduced us. Boris has become a very close friend, a part of our family. Boris frequently visits at our home and is invited to all the celebrations. He has also become friendly with my parents, Soon after making his acquaintance, they were inviting him to their house for Thanksgiving and other holidays.

I can honestly testify that Boris is a remarkably decent and kind person. I have always known Boris to be a law-abiding and respecting person and I'm stunned and saddened to learn that he has been convicted of a serious crime. Boris is exceptionally bright individual with encyclopedic knowledge on the number of topics. He's someone whom I can go to for answers on trivial matters as well as important issues and always get a thorough and valuable answer. But more impressive than his knowledge is Boris's willingness and desire to help. He is the first person outside of my immediate family I would ask for help or advice. On numerous occasions, Boris has driven me and other members of my family to the airport, even when this was at odd hours of the day. Whatever the situation, Boris always goes above and beyond the expected to help his friends.

I hope I was able to convey to you that Boris is a personal of high moral character and gentle nature, It is possible that some people may even take advantage of his good nature. I hope that you will find this information useful when considering Boris' sentence. I am happy to be of help in this matter and will be glad to provide any further assistance if needed.

Respectfully,

Anna Lubarsky

### EXHIBIT 43

 Beth Israel Deaconess Medical Center

 A teaching hospital of Harvard Medical School

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

March 20, 2010

Your Honor:

I am writing on behalf of my old friend Boris Levitin. I am an associate professor of medicine at Harvard Medical School and head of a research laboratory at Beth Isra-

el Deaconess Medical Center. I have known Boris for almost twenty years since I came to U.S. as a postdoctoral fellow at MIT. Boris was one of a few friends who introduced me to the customs and rules of this country. Boris' encyclopedic knowledge is a most valuable resource for all around him. In addition I was fortunate to get some professional assistance from Boris: on several occasions he helped me to develop certain data management software for my laboratory. I perceive Boris as a highly competent hard working professional capable of undertaking and efficiently and successfully tackling complex software development assignments. Boris' professional excellence is complemented by his genuine humanity. I vividly remember him taking care of my parents for several days, showing them around Boston when they visited the U.S. from Moscow, Russia. I am touched by his caring and supporting relationship with one of our mutual friends, Evelina, a senior woman with health-related disability.

I was astonished to learn that Boris was accused of a crime. Boris' benevolent and compassionate personality might have made him an easy target to take advantage of. Boris is the opposite of a criminal in nature, and I see what happened as an accidental exception in his life. Boris deeply regrets what has happened, and the enormous stress that I observed as well as severe financial burden that resulted seem to be quite a punishment by themselves. Boris is unfortunate to have very poor health, which makes the stress and potential sentence particularly challenging for him.

I hope my account will helpful for you, your Honor, in passing sentence on him. I will be happy to be of any further assistance.

Sincerely,

Konstantin Khrapko, Ph.D.

Associate Professor of Medicine

Harvard Medical School

Beth Israel Deaconess Medical Center

[redacted]

Boston, MA 02215

### EXHIBIT 44

Irina Cherenkova

[redacted]

Wellesley, MA 02482

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

May 11, 2010

Your Honor,

I write to you as a character witness for Boris Levitin and to ask you to show compassion when sentencing him.

I have known Mr. Levitin for several years, and I truly appreciate his friendship, strong personality and kindness.

Thanks to Mr. Levitin's help, I could find a job very quickly after my returning to the USA after an absence of many years. Mr. Levitin warned me against unproductive opportunities in this regard and saved my time and money. He introduced me to a professional group, the local chapter of the Audio Engineering Society, and drove me to their meeting when I did not yet have a car.

Mr. Levitin is the first source for me when I need an advice or opinion. I rely on him in any difficult or happy moment.

Not only did he help me, when I got to the USA a year ago, but with his huge knowledge and kindness he became a very important person, a friend. I see how much

help he brings to me and my friends despite being under the stress of the criminal case against him. He realizes that he has made a terrible mistake that is unworthy of him. I urge you in the strongest possible terms to spare him.

Please, be lenient and understanding in sentencing Mr. Levitin.

Thank you,

Irina Cherenkova

## EXHIBIT 45

[redacted]

Birmingham, MI 48009

June 15, 2010

The Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

Joseph Moakley Courthouse

One Courthouse Way

Boston, MA 02210

Your Honor:

My name is Amanda Warner. I currently work for REDICO, a real estate company based in Southfield, Michigan. Prior to relocating to Michigan in 2006, I lived in Brookline from 2001–2006. I moved to Boston for graduate school in communication studies (M.S. 2003) and remained there for work until 2006.

I met Boris Levitin in the spring of 2002. As part of my Master's Degree, I worked at WGBH in the Research + Intelligence Department. We were colleagues until I left WGBH in January 2003 to work for another company. We have remained in touch since then. I appreciate his honesty, candor, and knowledge.

When I think of Boris, I think of dedication to his career. He had tremendous loyalty to WGBH and public broadcasting, as well as the integrity of research. He would insist on what he saw as right rather than concede to a group opinion. He worked more hours than asked of him, and I often wondered if he ever saw daylight. It was clear to me that it was not just a job to Boris, which is evident in his decision to continue working for public television after being laid off from WGBH.

During 2002, our department head was Luiz Duarte, who is currently the Senior Marketing Manager at DIRECTV. I know that he and Boris also continue a professional relationship. Luiz has strong beliefs about honesty and integrity and would not associate with individuals if he doubted their human or professional qualities.

Boris's strength is his work ethic. His social skills, however, are his weakness. I can see how he could easily be misled or manipulated.

I understand that Boris has pled guilty to serious charges and that he compensated his client fully, having found that his actions caused harm to his client. This is nothing less than what I would expect him to do.

Your Honor, I ask that Boris's professional life, which means the so much to him, not be destroyed so he can continue to contribute to the communications research industry and society at large.

Sincerely,

Amanda Warner

### Harley S. Gordon

ATTORNEY AT LAW

[redacted]

NEWTON, MASSACHUSETTS 02464

[redacted]

June 2nd, 2010

To The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

1 Courthouse Way

Boston, MA 02210–3027T

Judge Tauro,

I write to you, not at the behest of Boris Levitin who did not ask me to, but on my own volition. It is my hope that the following insights may be helpful in reaching an appropriate disposition when Mr. Levitin is sentenced.

I am a member in good standing of the Massachusetts Bar since 1977. I have practiced in the field of long-term care financing for over 25 years during which I have authored two books, numerous articles and a nationally recognized training program with over 16,000 graduates. The success of these ventures is due in substantial part to my collaboration with Mr. Levitin. He has served not only as an editor but also as a strong and steady voice in setting a tone of ethical conduct in these works.

And in that last respect, I believe Mr. Levitin has set his own example of ethical behavior. In my 16 years in working with him I have never questioned a bill; his fees have been modest to the point where I have had to, on a number of occasions, increase them. Perhaps more telling is his lack of interest in billing in general; Boris is an intellectual at heart and often becomes so involved in projects that he forgets to bill me and others I have referred him to.

Boris may be a lot of things but I will put my reputation on the line when I suggest to you what he is not: a calculating, dishonest individual driven by money.

My belief and trust in Mr. Levitin is absolute. During the last few years I have not only continued to give him work but have recommended his services to others.

### HARLEY S. GORDON

Mistakes, of course, are the result of decisions; serious mistakes can be driven by character or circumstances. If the former, it is likely they will be committed again because they speak, in the aggregate, to the lifelong traits that formed the person.

I believe Boris' inappropriate decisions were driven by a set of circumstances inextricably tangled in a set of deeply personal issues. This is not a defense of what he did but rather the opinion of a person who still respects the man and would not hesitate to work with him in the future if the Court gives him the opportunity. A studied review of his life will hopefully lead the Court to conclude that he is a good and decent man who made a bad decision.

Respectfully Submitted

Harley Gordon

BBO: 203080

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

1 Courthouse Way

Boston, MA 02110

June 14, 2010

Your Honor:

I am Natalya Bodyak, Ph.D., currently a Group Leader at the biotech company Cequent Parmaceuticals, Inc. I am honored to have known Mr. Boris Levitin for over 10 years.

I moved to the United States to pursue my career in science and did my postdoctoral training at Harvard Medical School. As a person who had moved to a different country, I had a hard time adjusting to a different life style away from friends and relatives. Boris, whom I met shortly after

my arrival in Boston, offered his help right away and soon we became friends. He would not hesitate to spend his valuable time helping me to find an apartment to stay, or to open my cell phone account. Whenever I encountered a problem or had a question Boris was always ready to help. I can always rely on him. Boris impressed me with his ability to give and share.

I witnessed many times how Boris was helping other people in many different ways: from just giving a ride, to coaching how to use a computer.

Boris is a nice, warm-hearted, caring person I am happy to be friends with. I find it very sad that he now finds himself facing prison as a result of decisions he made, which, I think, were likely the results of these same character traits. I know that he is still tortured by what happened and cannot believe that he acted in such a foolish way. He is a good man; I ask that you exercise compassion towards him, and not destroy him.

Sincerely,

Natalya Bodyak

[redacted]

Brookline, MA, 02446

The Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

1 Courthouse Way

Boston, MA 02110

June 14, 2010

Your Honor:

My name is Aleksey Yeremenko; I am a software developer. I've known Mr. Boris Levitin for over 10 years. I met him in Boston soon after I immigrated to the United States. I found Boris a very friendly, knowledgeable and intelligent person. During these years I've had multiple opportunities to have an interesting conversation with him, to appreciate his sense of humor and great taste.

I know Boris as a very polite, respectful person with very high moral standards. I appreciate his friendship and want to support him at time when his integrity is questioned. In my view, the very qualities that make him a wonderful friend have also proven dangerous to him. He is rather naïve, sometimes unable to tell whether someone is serious or joking, and he has trouble knowing whom to trust; I've seen this happen (in circumstances not related to the case before you), and it caused Boris great pain. He is also too forgiving, too quick to try to understand someone else. I believe he recognizes that he has made terrible errors in judgment and that he is genuinely remorseful. I understand he has already refunded all the monies advanced to him by his client in this case, to its satisfaction.

Partly because we are both technical professionals, I know that for Boris his work is his self-expression. I cannot imagine my life if I lost the ability to practice my profession. I think Boris is the same. I ask you not to deprive him of the most important aspect of his life.

With best regards,

Aleksey Yeremenko

[redacted]

Brookline, MA, 02446

[redacted]

**практика**

Practica Publishers, Ltd.

[redacted]

119019    Moscow, Russia

[redacted]

Hon. Joseph L. Tauro

United States District Court

District of Massachusetts

One Courthouse Way

Boston, MA 02210

May 20, 2010

Your Honor,

I know Boris Levitin since the late 1980's, when I frequently came to Boston for business purposes, being a medical doctor. Boris pleasantly surprised me with his friendliness, his easy manner, his eagerness to help, the encyclopedic scope of his knowledge and his decency. I remember myself thinking: how good it was to live in a free country, where an adult can always remain such a child. During the 20 years that we have known each other, Boris has not changed and has never given me any reason to be disappointed in him.

In the early 1990's there was a palpable lack of high-quality medical books in Russia, so we decided to start a publishing house to translate American medical books into Russian. Boris was the person who established relations with American and later European publishers, who convinced them that we were worthy of their trust despite the pandemic of piracy in Russia, and who persuaded them to be reasonable in their royalty demands while we were starting up, Thanks in large part to him, Practica Publishers became a respected and authoritative medical publishing house in Russia. But in the fiscal crises of 1998 and again last year, respect and authority were not enough for our company to survive. Boris has often literally saved our publishing house from ruin by extending or renewing contracts with foreign publishers, arranging funding and finding investors.

Practica is experiencing a very tough environment at the moment because of the economic downturn, still very severe in Russia. Many of our employees have found other, better paid jobs. But Boris, who has received no financial compensation in several years, has remained loyal and continues to work with us despite his extremely difficult situation today. He shares our belief that Practica Publishers is very important for Russian doctors, who find in our books the latest information on medical and surgical treatment, and therefore to their patients. Frankly, we would be very hard-pressed to survive without him, especially right now when we are in survival mode.

Knowing Boris as an honest, thoroughly decent man and a devoted friend, I cannot imagine him to have purposely violated the law. I believe it is his best qualities, namely his kindness, his nature of a good and trusting man, that have got him into his current trouble. I ask your honor to

try to recognize the character of the man before you, to have sympathy for the situation he is in and for his very alarming medical condition, and finally to avoid harming our company, the important work it does and its several dozen employees and contractors as well as their families.

Sincerely yours,

Vladimir Ananich, M.D., Ph.D.

Vice-president

[redacted]

Jak Schibley

[redacted]

Plymouth, MA 02360

[redacted]

April 28th, 2010

Dear Judge Tauro,

I've worked with Boris Levitin in several capacities since 1985 and feel compelled to convey some of what I have learned of him to you in hope that you might find him worthy of leniency in sentencing. Currently, I am employed by Google as a technical program manager. Prior to joining Google, I owned a consulting business, PubTV Online, which provided data delivery and analysis services to Public Television.

I first began working with Boris in 1985 when I was a software consultant for PMN Trac (now Trac Media Services), a public television research consultant. At this time Boris worked for WGBH, the public television station in Boston which is a major producer of national programming. From 1985 to 1993, he was my technical point-of-contact at WGBH and worked with me to produce Trac's data feeds for his reporting systems. He reported to Pat Harris who prior to her passing was one of the most respected researchers in Public Television. I know she valued Boris' contribution to her team.

In 1997 when I founded PubTV Online, WGBH was one of my first clients, and again I worked with Boris to supply data to WGBH. He designed and created an automated system in Excel to import and parse data files and then create reports for WGBH. In general, systems with this level of automation and fed by secondary data suppliers are notoriously finicky, but Boris' system performed consistently well.

When Boris approached me to do research for PubTV, we were happy for the opportunity to work with him. He designed and produced a weekly newsletter named 'Context' which had good distribution inside of our client base. When PubTV was bought by our competitors, they kept on Boris and had him continue producing 'Context' at the request of our clients, even though they had their own weekly newsletter.

Though I am not currently working in the audience analysis realm, I've kept up with Boris' work in this arena and was not surprised to find that he has been producing reporting systems for TiVo then DIRECTV. The examples I've seen demonstrate his skills at creating data analysis and reporting systems, and I hope very much that nothing would prevent him from continuing to pursue this project which I think would suffer without him.

Boris always struck me as one motivated by pride of workmanship rather than money. His conversations were always dominated by what he needed to get his analysis done and to meet his high expectations. On the other hand, on one occasion there was an error with our accounting system, and Boris did not get paid for some time, but he was very gracious about it.

Along with Boris' technical and creative skills, I've admired his moral grounding and the attention he puts into his personal relationships. I've known him to strive for honesty in absence of any potential consequence and to display loyalty beyond the

point of self sacrifice. I've trudged though the rain with him to an ATM and back to supplement a tip he worried was too small, and now I'm watching him undergo this process. Though It all he manages to find concern for others' issues.

I am aware of the details of the case against Boris. I am shocked by his uncharacteristic failure of judgement. I nonetheless can confidently say that, if the opportunity to work with him arose again, I would do so without any hesitation. I also continue to consider him a trusted friend. His kindness and fierce loyalty to his friends is inspiring.

Thank you for your time in reading this letter. Please feel free to contact me if you think any additional information or action might be of use.

Sincerely,

Jak Schibley

Hon. Joseph L. Tauro

Senior United States District Judge

District of Massachusetts

One Courthouse Way

Boston, MA 02210

August 11, 2010

Your Honor:

I am writing on behalf of my friend, Boris Levitin, whom I met at Boston University in 1985 where we were both students. I am aware of the charges that have been brought against Boris and I understand that he has pleaded guilty to mail fraud. I'm writing this letter to let you know that in the 25 years I've known him, Boris has been an honest person and a good friend.

Since the day I met Boris, he has been nothing but generous and kind. I can honestly say that I've never heard Boris speak ill of anyone, ever. I do not believe that he is a greedy person. In fact, he

lives very modestly. Without being disrespectful, 1 would describe Boris as naive and trusting. He is easily manipulated and misled. I believe that these qualities may have left Boris incapable of fully appreciating or understanding the intentions of his codefendant.

I know that Boris is extremely remorseful about what happened. I do not believe that he would ever cheat anyone.

Thank you for your time and please contact me if I can be of further assistance.

Sincerely,

Sonia Chan

[redacted]

Lafayette, CA 94549

[redacted]